UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
                                  .
IN RE:                            .  Chapter 7
                                  .
DENNIS LYNN SWARTZ, JR. and       .  Case No. 24-14190-pmm
WENDY MAY SWARTZ,                 .
                                  .  201 Penn Street
                                  .  Reading, Pennsylvania 1961
               Debtors            .
. . . . . . . . . . . . . . . . . .  Tuesday, March 11, 2025
```

TRANSCRIPT OF MOTION TO CONVERT CASE TO CHAPTER 13
BEFORE THE HONORABLE PATRICIA M. MAYER
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:            DAVID W. TIDD, ESQ.
                            200 Spring Ridge Drive, Suite 100
                            Wyomissing, Pennsylvania 19610

For the Chapter 7
Trustee:                    Robert W. Seitzer, Esq.
                            KARALIS, PC
                            1900 Spruce Street
                            Philadelphia, Pennsylvania 19103

Audio Operator:             Electronically Recorded
                            by Keith R. Borzillo, ECRO

Transcription Company:      RedDoor Legal Services, LLC
                            44 Valley Forge Road
                            Bordentown, N.J. 08505
                            (973)985-3668
                            www.reddoorlegalservices.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>INDEX</u>

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE DEBTORS | | | | |
| RYAN ACHENBACH | 12 | 47 | | |
| WENDY MAY SWARTZ | 53 | 62 | 66 | |
| DENNIS LYNN SWARTZ, JR. | 68 | 82 | 109 | |
| FOR THE CHAPTER 7 TRUSTEE | | | | |
| DAVID PETER DECEMBRINO | 92 | 103 | | |
| REBUTTAL FOR THE DEBTORS | | | | |
| RYAN ACHENBACH | 110 | | | |

| | PAGE |
|---|---|
| ARGUMENT BY MR. SEITZER | 128 |
| ARGUMENT BY MR. TIDD | 131 |
| FURTHER ARGUMENT | 136 |
| COURT DECISION | (Under Advisement) |

| EXHIBIT | EVID. |
|---|---|
| M-1  Appraisal of 815 Texter Mountain Road | 125 |
| M-2  Appraisal Update | 125 |
| M-3  Updated Appraisal with Online Value | 125 |
| M-5  Income Summary | 125 |
| T-4  Decembrino Comparative Market Analysis | 124 |

1        (Proceedings commence at 3:02 p.m.)

2        THE CLERK:  Okay.  Back to the Reading matters.

3    We'll call Matter Number 16, Dennis Swartz, Wendy May Swartz,

4    motion to convert case to 13.

5        MR. TIDD:  Good morning.

6        THE COURT:  Okay.  Good morning.

7        So why don't we -- we'll start with appearances,

8    and then we'll get right into it, so --

9        MR. TIDD:  David Tidd for Debtors Dennis and Wendy

10   Swartz.

11       THE COURT:  Okay.

12       MR. SEITZER:  Good morning, Your Honor.  Robert

13   Seitzer on behalf of Christine Shubert, the Chapter 7

14   Trustee.

15       THE COURT:  Okay.  Mr. Tidd, it is your motion to

16   convert, so ...

17       MR. TIDD:  Yes.  I'd like to begin with a Rule 702

18   examination of Mr. Ryan Achenbach, our appraiser.

19       THE COURT:  Okay.  Mr. Seitzer, do you --

20       MR. SEITZER:  If I may just comment, Your Honor?

21       THE COURT:  Okay.

22       MR. SEITZER:  The debtors' bankruptcy schedules

23   reflect that there's no disposable income, and it appears as

24   though the debtors, today, intend to put on evidence dealing

25   with equity in this real property at issue.

1          First of all, if there's no equity, why would be

2   here, Your Honor?  And this is -- this hearing, at least from

3   what the debtor is going to try to do, is turn this into a

4   valuation hearing, essentially turning into it, instead of a

5   motion to convert, a motion to compel the trustee to abandon

6   the property.  And I think, in that scenario, Your Honor,

7   that the property should just hit the market and see what the

8   market shows.

9          If there is no equity, it's over.  I mean, if we're

10   going to have a valuation hearing between the debtors' broker

11   and the trustee's broker, then wouldn't it just be easier to

12   have the house hit the market, Your Honor, and see if there's

13   equity or not?

14          THE COURT:  Well, I'm confused.  So are we not

15   going to convert this?  We're just going to have a valuation

16   hearing to find out whether or not the Chapter 7 Trustee is

17   willing to sell it?

18          MR. TIDD:  No, I have a motion to convert pending.

19   I don't think that response is appropriate.

20          In fact, the second page of the objection deals

21   with our valuation versus the trustee's believed --

22          THE COURT:  Well --

23          MR. TIDD:  -- valuation.

24          THE COURT:  -- my understanding was that it was

25   twofold:  It was -- it's a Marrama hearing, right?

1          MR. SEITZER:  Uh-huh.

2          MR. TIDD:  Yes.

3          THE COURT:  It's whether or not there was bad faith

4     in filing and --

5          MR. TIDD:  Yes.

6          THE COURT:  -- what are the elements of bad faith

7     her.  One is, perhaps, the undervaluation of the property --

8          MR. SEITZER:  Uh-huh.

9          THE COURT:  -- another being that perhaps there

10     isn't money to fund a Chapter 13 plan, so you can't really be

11     a Chapter 13 debtor.

12          MR. TIDD:  Right.

13          THE COURT:  So, with that understanding, I mean, I

14     do think that the debtor has the burden to show good faith,

15     and probably the only way for him to do that is to present

16     his testimony.

17          MR. SEITZER:  But it's --

18          MR. TIDD:  It's critical--

19          MR. SEITZER:  -- for the --

20          MR. TIDD:  -- to have --

21          MR. SEITZER:  -- real estate broker.  All the

22     exhibits deal with appraisals, Your Honor.

23          THE COURT:  Well --

24          MR. SEITZER:  The debtors' exhibits deal with

25     appraisals, that's it.

1          MR. TIDD:  That's how we came to the valuation,

2     that's what was provided to the trustee --

3          THE COURT:  So is this the --

4          MR. TIDD:  -- by request.

5          THE COURT:  So tell me who it is that's going to

6     testify.  It's not the appraiser?

7          MR. TIDD:  The appraiser, yes.

8          THE COURT:  It is the appraiser.

9          MR. TIDD:  Yes, the person who provided -- who

10    prepared the appraisal that was given to Trustee Shubert.

11         THE COURT:  Okay.

12         MR. TIDD:  How can I --

13         THE COURT:  And --

14         MR. TIDD:  -- have a good faith --

15         THE COURT:  And this was an appraisal that was done

16    prior to filing.

17         MR. TIDD:  Prior to filing, it was done three times

18    prior to filing, to make sure it was right all the time.  And

19    the process by which this particular professional appraiser

20    came to do all this is the crux of the good faith argument we

21    have that all of this work prior to filing resulted in a good

22    faith basis for what we put as value, which isn't even stated

23    correctly in the objection.

24         We have a valuation at 584,000, less cost of sale,

25    with a yield of five twenty-five, and it stated that we put a

1    valuation of five twenty-five.  We didn't, we clearly have on

2    the schedules, in the comment section, how we do it.  It's

3    what's done on every Chapter 7 petition I've ever seen,

4    including all of mine.  You put the appraised value, less

5    cost of sale; and, for the sake of Schedule C, you then take

6    the resulting 90 percent and put that on the property value,

7    so --

8              THE COURT:  Is that the way the Chapter 7 Trustee

9    see it?  I understand --

10             MR. SEITZER:  Yeah, that --

11             THE COURT:  -- not in a --

12             MR. SEITZER:  That --

13             THE COURT:  -- Chapter 13 --

14             MR. SEITZER:  That --

15             THE COURT:  -- right?

16             MR. SEITZER:  That's the way --

17             THE COURT:  Okay.

18             MR. SEITZER:  -- it's typically done.

19             THE COURT:  Okay.

20             MR. TIDD:  Yeah.

21             THE COURT:  Okay.

22             MR. SEITZER:  Just perhaps, just looking at

23    Schedule D, I don't believe it has that language, but it

24    might have --

25             THE COURT:  Okay.

1        MR. SEITZER:  -- docket -- Schedule A, B, and I'll

2    --

3        THE COURT:  Right.

4        MR. SEITZER:  -- take his word for it, yes.

5        THE COURT:  Okay.

6        MR. TIDD:  It's there, it's --

7        THE COURT:  Okay.

8        MR. TIDD:  -- on schedule -- it's on A/B.

9        THE COURT:  So let me ask this question.  So you

10   intend to -- after the testimony, but you intend to press

11   your motion to press your motion to convert this to a Chapter

12   13 and pay something into the plan, based on whatever that

13   valuation is.

14       MR. TIDD:  No, not based on the valuation at all.

15   We're going to let Chapter 13 tell us what we have to pay.

16       The assertion that we have no money to pay with

17   would only be based on looking at the current amended I and J

18   and not reading the amended I, which clearly states we took a

19   HAVEN Act exemption.  We wrote on Schedule I that we only

20   included a portion of Mr. Swartz's VA disability.  He has a

21   VA disability of 3,900 and change, documentation provided to

22   the trustee, we -- after the U -- to the Chapter 7 Trustee,

23   after the U.S. Trustee reached out and said look, we'd really

24   prefer -- and I have Ms. Deininger, her email to me saying

25   we'd really like you to have it zeroed out on J --

1          THE COURT:  Uh-huh.

2          MR. TIDD:  -- so just do the work on I.

3          THE COURT:  Uh-huh.

4          MR. TIDD:  So, instead of showing an exempt amount,

5    an amount on J that's ultimately non-reachable by the

6    trustee, per the UST's office, I made the change and only

7    included the amount necessary to cover the expenses from

8    which he drew that from --

9          THE COURT:  Okay.

10          MR. TIDD:  -- leaving $2,500 more.

11          And in fact, there was an extensive conversation at

12    the 341 meeting between myself, Mr. Swartz, and Trustee

13    Shubert about how that all works, as far -- meaning she

14    wanted to make sure that that amount was, in fact, non-

15    reachable.  And in fact --

16          THE COURT:  Uh-huh.

17          MR. TIDD:  -- she had asked for a supplemental

18    upload on my part to show that it was VA disability.  I think

19    I already provided it once, but I provided it singularly,

20    again, prior to the meeting, to show.

21          So we talked about the gross income.  The initial

22    schedules clearly show there's extra.  And then it clearly

23    shows we took it off because it can't be reached in the

24    normal course of a case because of the HAVEN Act in 2019,

25    which brought under the Social Security and regular SSD

1   umbrella VA benefits.  And in fact, he's 100 percent service-

2   disabled.

3            THE COURT:  So the only available disposable income

4   --

5            MR. TIDD:  Is what he wants, yeah.

6            THE COURT:  -- is the pension income, I presume.

7   It's the only thing that would be --

8            MR. TIDD:  Or --

9            THE COURT:  -- not excluded.

10           MR. TIDD:  He can do it that way or he can just

11  voluntarily --

12           THE COURT:  No, no, no.  I --

13           MR. TIDD:  -- or just --

14           THE COURT:  But --

15           MR. TIDD:  -- or switching, yes.

16           THE COURT:  -- in terms of what would be required.

17           MR. TIDD:  Yes.

18           THE COURT:  Okay.  Okay.

19           MR. TIDD:  That's all.  And he's not required to

20  take -- of course, as you know, he's not required to

21  substitute that, so he's got it --

22           THE COURT:  Right.

23           MR. TIDD:  -- exempt.  You know, he can choose to

24  spend the pension money on his expenses and leave the Social

25  Security exempt.

1          So, really, as is Trustee Waterman's practice, in a

2     case like this, where you have this, we can put in whatever

3     his minimum is.  That's -- we didn't make the rules.

4          THE COURT:  So the overarching issue is whether

5     there's any equity.

6          MR. TIDD:  Exactly.

7          THE COURT:  Okay.

8          MR. TIDD:  And I would think that's what the issue

9     was.  It's the primary, it's the first issue reached --

10         THE COURT:  Right.

11         MR. TIDD:  -- in the objection.  And of course,

12    it's not the only animal in the room, but it's the elephant

13    in the room because, if you go down to the four factors for

14    bad faith, you have to have an understanding of how the value

15    came about to determine three of the four factors for a bad

16    faith determination.  And the burden on us to prove good

17    faith.

18         THE COURT:  Okay.  With that, I'm going to allow

19    him to put his --

20         MR. SEITZER:  Okay.

21         THE COURT:  -- broker on.

22         MR. SEITZER:  Understood, Your Honor.

23         THE COURT:  Okay.  Call your witness.

24         MR. TIDD:  Mr. Achenbach.

25         (Participants confer)

1          MR. TIDD:  Your Honor, before you being, since we

2    are -- I presume we're all -- we're going to -- I am already

3    tethered.

4          THE COURT:  Uh-huh.

5          MR. TIDD:  But I'd like to be able to see.  Is it

6    okay to question from the podium --

7          THE COURT:  Yes.

8          MR. TIDD:  -- to the extent that I can?

9          THE COURT:  Yes.

10          MR. TIDD:  Okay.  Thank you.

11          THE ECRO:  Please raise your right hand.

12          RYAN ACHENBACH, WITNESS FOR THE DEBTORS, SWORN

13          THE ECRO:  State your name and spell your whole

14    name for the record.

15          THE WITNESS:  My name is Ryan Achenbach, first name

16    is R-y-a-n, last name is A-c-h-e-n-b-a-c-h.

17          THE COURT:  You can have a seat.

18          THE WITNESS:  Thank you.

19                    DIRECT EXAMINATION

20    BY MR. TIDD:

21    Q    Mr. Achenbach, would you state your name again, please?

22    A    My name is Ryan Achenbach.

23    Q    And how are you employed?

24    A    I am employed as a self-employed contractor, as a

25    certified residential real estate appraiser in the State of

1   Pennsylvania.

2   Q    And what does it mean to be a certified, registered real

3   estate appraiser in Pennsylvania?

4   A    Specifically, you have to go through a -- currently, a

5   twenty-five-hundred-hour apprentice trainee program, and then

6   you take a test, which is proctored by the State, in order to

7   get your certification; that gets renewed every two years.

8   Q    And how long did it take you to apprentice and with whom

9   did you apprentice?

10  A    I -- I apprenticed with my father's appraisal business.

11  That was -- I started in 2001.  It took me three years to get

12  through the hours, which is, essentially, going along on

13  appraisals.  I -- you know, you begin filling out forms.  You

14  have to send all your information into the State.  And then,

15  like I said, you have to take a state certification exam, and

16  I did that in 2004.

17  Q    And have you been licensed continuously since 2004?

18  A    Yes.

19  Q    No interruptions?

20  A    No.

21  Q    Have you ever been disciplined by the governing body for

22  appraisals?

23  A    No.

24  Q    What tools or special knowledge do you have to do an

25  appraisal that -- insofar that you have to be licensed for?

1    A    Specifically, I believe it's the -- the training we

2    acquire in regards to choosing comparable sales.  I think

3    that's a very distinct difference between an appraisal done

4    by an appraiser, such as myself, or the differences, what you

5    might hear about, between BPOs or CMAs, which are done by

6    realtors.

7    Q    And what is a "BPO"?

8    A    I believe it's known as a "broker's price opinion," and

9    a CMA would be a "comparative market analysis."

10   Q    And how would you describe the difference between what

11   you provide and the -- if you can make it one category, the

12   BPO and the CMA?

13   A    I've only ever done an appraisal, so, to my knowledge,

14   we both have access to the realtor database, which is known

15   as the "MLS," the multiple listing service.  So, at any given

16   time, I can get in there as an appraiser and simply pull up a

17   range of properties from a certain area, put in a certain

18   price point.  I could then have the MLS run me a whole series

19   of statistics to give me some sort of data in return.

20       I think it's different for an appraisal because I

21   physically go out to the property, I inspect the interior and

22   the exterior of the property.  In this case, I walked the

23   extensive land that was there.  And then I take all that

24   information, which gives me a pretty unique identifying

25   characteristics of the property, and then I try to find

1   comparable sales.

2        So, essentially, I'm taking, not only just an area; I'm

3   taking the house itself, I'm trying to find properties that

4   are similar in age, similar in -- in land size, you know,

5   similar in condition.  I think it's far more extensive, and I

6   believe that's the clear reason why an appraisal is the only

7   way to -- is -- can only be provided on like a mortgage.  You

8   cannot enter in an appraisal that's done by a realtor for a

9   mortgage, a CMA or a BPO; it has to be an appraisal.

10  Q    So the basis for lending would have to come from you,

11  not a realtor, who's trying to buy -- trying to help someone

12  buy a property.

13  A    In Pennsylvania, currently, yes.

14  Q    Okay.  Now is there a way to tell if a comparable now

15  was a comparable in the past, with respect to a property, and

16  does that help you determine if it's a comparable now or not?

17  A    I typically will do a sales history of each property

18  that I am considering using as a comparable.  And you know,

19  that's accurate to the extent that there is a sales history.

20       Typically, if it's a property, for example, that might

21  have had 3 listings over the course of 20 years, it was

22  listed and sold each time, you can kind of look back and --

23  and see.  If -- if I feel like the property is comparable

24  now, I can look back and see the sales history, to see if

25  that matches what I might have for the subject property.

1          So it's hit or miss.  You don't always have the -- you

2     know, the luck of having a complete sales history.  But

3     usually, if you're looking at enough properties, you can kind

4     of start to -- to put all of the investigation together.

5     Q    Is a true comparable, at present, something that was

6     always a comparable before, two properties all being equal

7     throughout that time?

8     A    Most likely, if the properties are equal.  The only

9     distinctive factor would be, if, for example, one property

10    was remodeled and the other wasn't.  But you would typically

11    -- you know, I can look at those listings that occurred over

12    the last 20 years, I can read the comments, I can view

13    photos, I can -- I have a lot of information at my disposal,

14    to try to see how property was historically and how it is

15    currently.

16    Q    And with respect to the subject property, and with

17    respect to the comps, as well --

18    A    Uh-huh.

19    Q    -- is there anything else that you feel you would need

20    to include in that analysis?  It can be yes or no -- or have

21    you exhausted the description of what's need?

22    A    I believe, where, you know, a -- pretty much, it's, you

23    know, the -- the condition, age, lot size, how close it is.

24    You know, proximity matters.  You know, I usually attempt to

25    stay -- and that will change a little bit.  If I'm in, for

1   example, an urban environment, I'm typically trying to stay

2   within a half-mile, maybe a mile at the most, depending on

3   the market conditions.  As I get into more rural areas, it

4   might be up to ten miles.

5        So, you know, that's definitely a factor, too, because

6   people purchase based on school districts, different things

7   like that, so you're trying to find something, not only

8   that's similar to the -- to the subject property, but also in

9   a similar location.

10  Q    So a simple geographic radius isn't a sufficient manner,

11  is what you're saying.

12  A    Not necessary because markets can change, you know, just

13  crossing over township borders.  So it's important to kind of

14  know the area and know the -- you know, know the different

15  areas, you know, what the different school districts are, et

16  cetera.

17  Q    Would it be safe to say that what you've just described,

18  that process, are the principles and methods, the standard

19  operating procedure about how you come --

20  A    I would.

21  Q    -- about --

22  A    Yes.

23  Q    -- getting an appraised value?

24  A    Yes.

25             MR. TIDD:  I have nothing further with respect to

1    the Rule 702 examination, and I move that he be admitted as

2    an expert with respect to real estate value, of course

3    subject to cross-examination by trustee's counsel.

4                THE COURT:  Mr. Seitzer, do you have any objection

5    to him being qualified as an expert?

6                MR. SEITZER:  No objection, Your Honor.

7                THE COURT:  Okay.

8                MR. TIDD:  All right.  Thank you.

9    BY MR. TIDD:

10   Q    Now I would like to move to the subject property.

11        Do you know the address of the subject property?

12   A    Yes, it's 815 Texter Mountain Road.

13   Q    And did you and I have occasion to speak about Texter

14   Mountain Road last year?

15   A    In regards to when you ordered --

16   Q    Yes.

17   A    -- the appraisal?  In regards to its location and

18   everything I would need to know about it.

19   Q    Okay.  And when was that?

20   A    That would have been -- let's see.  My effective date

21   was June 29th, so it would have been, you know, a few days

22   before that.

23   Q    Okay.  Did I ask you to come up with any type of value

24   or did I tell you appraise the property?

25   A    It's typically here's the property, go appraise it,

1    which is, essentially, the same as a lending assignment that

2    I do.

3    Q    Okay.  So that's what I -- the assignment that I gave

4    you.

5    A    Uh-huh.

6    Q    And what inspection did you perform, if any, of that

7    property?  Did you make a site visit?

8    A    Standard, as always, call up the borrowers, schedule a

9    time when I can some see the property.  I get to the

10   property, typically -- typically start on the outside, photo

11   a little bit of the -- of the outside of the property.

12        Then, typically, I'll move in for the interior

13   inspection.  And that consists of going into every single

14   room.  I'm typically drawing a floor plan, I'm writing

15   different notes about the materials that make up the

16   property, you know, the room sizes, things like that.  I'll -

17   - I'll do measuring on site.

18        Pennsylvania is -- I don't know if it's unique, but you

19   know, they now allow you to take the exterior dimensions and

20   include everything on the inside.  So I'm not itemizing, you

21   now, room sizes, but I am taking, you know, exterior

22   dimensions, and then you -- you count everything on the

23   inside.

24        I proceeded from there to go to the exterior, which was

25   -- this is an extensive property.  It has 14 acres on the

```
1    main parcel, so -- and that is, essentially, what encompasses

2    everything about this subject property.

3         Now there is an additional rear parcel that's --

4    Q    I'd like to hold you there.

5    A    Sure.

6    Q    Can you stick with the -- because there -- I believe we

7    have three segments to this property, correct?

8    A    Okay.

9    Q    Three different counties involved?

10   A    Two counties, three townships.

11   Q    Three townships.

12   A    Yeah.

13   Q    And we have three lots, essentially, on --

14   A    Two lots.

15   Q    Two lots on --

16   A    Yes.

17   Q    -- one deed.

18   A    Yes.

19   Q    Okay.  So what acreage plot or what number plot and what

20   acreage is that, that the house sits on?

21   A    The house sits on a fourteen -- approximately a

22   fourteen-acre parcel.

23   Q    Okay.  And then you --

24   A    That's the main property.  That has the right-of-way

25   that comes in on the driveway off of Texter Mountain Road.
```

1   Q    Okay.  And how would you describe the type of home, type

2   of construction, condition?

3   A    It's a two-story home, it is regular frame construction,

4   nothing that is -- you know, would be considered custom.  It

5   had wood siding on the exterior, typical asphalt shingle

6   roof.  It does have a deck attached to it and a simple above-

7   ground pool, so the deck kind of goes around the above-ground

8   pool.  And it does have, also, just a traditional attached

9   two -- two-bay garage.

10  Q    And did you provide photographs in your appraisal?

11  A    Yes.

12        MR. TIDD:  Your Honor, I'd like to refer you to

13  what's been marked as -- I put it as M-1 for "movant."

14        THE COURT:  Do you want to pull it up for --

15        MR. TIDD:  Oh, I'm sorry.  Yes.

16        THE COURT:  -- for the witness?  I assume he needs

17  to see it.

18        MR. TIDD:  Yeah.

19    (Pause in proceedings)

20        MR. TIDD:  Now he's not able to scroll, I presume,

21  correct?

22        THE COURT:  No, you'll have to scroll for him.

23        MR. TIDD:  All right.

24  BY MR. TIDD:

25  Q    Now I'm showing you, right now, which I believe is page

1    -- it is Page 3 of 22.  Is that your signature?

2    A    Yes.

3    Q    What is the date of that letter?

4    A    6/29/2024, which is considered the effective date of my

5    appraisal.

6    Q    And the date up top, is that --

7    A    Oh, sorry.

8    Q    This is the --

9    A    That's --

10    Q    -- date of the letter itself.

11    A    The effective date is the -- the day I was at the

12    property, that's the day, essentially, that's captured as the

13    valuation date of the property.

14        The report was completed on July 16th, 2024, and that's

15    when it gets the official signature.

16    Q    Okay.

17    A    I apologize.

18    Q    And once again, that is your signature.

19    A    Yes.

20    Q    And the valuation was 584,000?

21    A    Yes.

22    Q    Okay.  Now I'm going to take you to the next page, which

23    I believe is Page 4.

24        And how do you describe -- I'd like you to go right to

25    "neighborhood information" and skip the parcel ID and things

1    like that.

2    A    Okay.

3    Q    What is contained in the field report section, titled

4    "Neighborhood."

5    A    Neighborhood is information about the surrounding area

6    of the subject property.

7        So the bulk of the property sits in Heidelberg Township.

8    So, essentially, what you'll see there for the neighborhood

9    information is because -- little parts of it go into two

10   other townships.  But what you have there is the general ID

11   of the neighborhood.  It's rural, it's not very built up.  I

12   have between 25 and 75 percent is mostly vacant land.

13       And then it also shows -- what I will do is go into the

14   MLS and I'll choose Heidelberg Township, and then I'll do a

15   review of sales over the last five years, to try to capture,

16   you know, the last, you know, year, then several historical

17   years, for the sales range that has occurred in that

18   township, which for this, currently and per that effective

19   date, was between 50,000 and 850,000, with a predominant

20   value in that area, which is statistically what comes -- you

21   know, what value is -- is most predominant, at 290,000.

22   Q    Is there a difference between predominant value and a

23   mean value or a median value?

24   A    Predominant would be considered more of -- of an average

25   for the area.

1    Q    Okay.  Now I believe you've already testified to what is

2    under "subject property."

3        Is there anything in that section that you have not

4    testified to?  You testified to wood siding and the shingles.

5    A    Uh-huh.  I don't believe so.

6        Zoning is -- is not a significant factor.  I did

7    research the zoning just to try to see because, once again,

8    we have this interesting two parcels, two distinct parcels,

9    on one deed.  So I wanted to kind of evaluate a little bit

10   about what the local zoning would allow.

11   Q    Now you took the time to add comments on here --

12   A    Uh-huh.

13   Q    -- beginning with "subject property is."

14       Would you review that and walk us through that.

15   A    Sure.  It's, essentially, what I went through.  The

16   subject property is a framed, two-story contemporary

17   dwelling, wood siding and shingled roof attached to a garage.

18   The interior has three bedrooms and two full bathrooms.  The

19   lower level is also finished with a bedroom, bathroom, family

20   room, and a kitchenette.  The property is well maintained and

21   updated and is considered in very good condition.

22   Q    And did you happen to measure the square footage of each

23   room with --

24   A    Not of each room --

25   Q    No?

1    A    -- because, like I said, that's not how it's done in

2    Pennsylvania for lending assignments, which is the bulk of

3    most appraisers' work.  What -- what we're instructed to do,

4    we file an ANSI -- ANSI standard.

5    Q    And what is an "ANSI standard"?  Let's start there.

6    A    It is something that only probably we know, and maybe

7    some --

8    Q    Well, the Judge needs to know now.  So what is --

9    A    Well --

10   Q    -- an "ANSI standard"?

11   A    -- it -- it's simply you measure the exterior to the

12   closest foot, you include everything on the inside.  Things

13   like stairwells are counted for a specific floor and not

14   counted for, you know, a different floor, depending on where

15   they descend or ascend to.  So it's just technical

16   specifications for how to -- to, essentially, create a

17   standard, so that appraisers here are -- are measuring the

18   same as appraisers in Pittsburgh, et cetera.

19   Q    And does "ANSI" actually stand for, I believe, the

20   American National Standards Institute?

21   A    I think so.

22   Q    Okay.  Thank you.

23   A    Yep.

24   Q    Now, under "market comparable analysis," which it sounds

25   like is the meat of this, we have the subject property first,

```
 1    which you've already gone over.

 2    A    Uh-huh.

 3    Q    Can you take us through comparable number one, what is

 4    it, why is it a comparable?

 5    A    So we're in a rural area.  I think it's important to

 6    just discuss how --

 7    Q    Can we identify that comp first, please?

 8    A    Sure.  It's 740 Vinemont Road in Reinholds.

 9    Q    All right.  Thank you.

10         Continue.

11    A    Sure.

12         Essentially, when I'm looking for comparables in a rural

13    area and you've got a property where you -- you have a house

14    and then you have a significant contributing factor, such as

15    land, when you're looking for comparables, it -- it's very

16    rare in a rural area where you're going to find exact

17    matches.  So what you, essentially, start doing is, is trying

18    to find property that are as similar as possible for at least

19    one major attribute, which for me is -- is -- primary is the

20    house.

21         So, essentially, I found a house that was very similar,

22    very similar in size, very similar in bedroom/bathroom count.

23    The subject is at 1,700 square feet; this was at 1,800 square

24    feet.  The subject has a two-bay garage; the comp has a

25    three-bay garage and at least some basement finishing.
```

1    So I, essentially, choose that then.  So we've at least

2    -- we've at least pulled something that is accurate in

3    construction.  It was a little bit less in condition, but

4    that's simply because it wasn't updated as much as the

5    subject property.  But it had similar wood siding, stand --

6    in that regard, you know, the house appearance, which you

7    will see in a photo on one of the other pages was -- was, I

8    think, very similar to the subject property.

9    Q    Okay.  Now comparable number two, which is listed as 18

10   Lisa Road in Reading.

11   A    Uh-huh.

12   Q    Is that correct?

13   A    Yes.

14   Q    And why was that chosen as a comparable in this

15   analysis?

16   A    Very similar.  It's an older home of approximately the

17   same age.  It had been updated in the interior to include --

18   typically, when -- when you have updating, it's improvements

19   to bathrooms and kitchens.  You know, you will typically, you

20   know, take a bathroom, maybe change out the vanities; in the

21   kitchen, get new cabinets, things like that.

22       It's also, you know, very similar construction.  These

23   are not custom homes; they're simply what would be considered

24   a builder-grade home, where you're -- you know, you're

25   generally using, you know, typical materials for a -- for a

1    typical house construction.

2    Q    And this actually came in -- so are you saying that's a

3    little bit better of a comparable, but the price is actually

4    a little less?

5    A    Better of a comparable is -- is -- like I said, you're -

6    - you're dealing with something where you have no perfect

7    matches.  So I'm trying to simply find comparables that are

8    reasonable --

9    Q    Okay.

10   A    -- is what I would say.  I would -- I would -- and I

11   would say the three comparables in here are the most

12   reasonable I found in regards to similarity of -- to the --

13   to the subject property.

14   Q    Now 340 Forest Avenue, was that the final comparable?

15   A    It was.

16   Q    And would you go through that, please?

17   A    That was slightly different.  So we're in this rural

18   area that's heavily wooded.  Essentially, comparables one and

19   two were -- are typical frame construction.  I could not find

20   any others that I felt were appropriate in regards to age and

21   construction, so I did kind of expand out a little bit and

22   decided to at least stay in the immediate market area.  So,

23   once -- once you're having to abandon one major attribute,

24   you have to at least lean on something else.  So I, at least,

25   try to stay within a close proximity to the subject property.

1     So this one was the closest to the subject at only two

2     miles away, even though it was a slightly different

3     construction and -- and was actually better; it was a log

4     home, now not a custom log home, it was more of a like a kit

5     log home.  But it was -- you know, it's newer at only 26

6     years.  It -- and like I said, it was in a little bit

7     superior condition.  But otherwise, it had a two-bay garage.

8     You know, it's out in this rural area, surrounded by woods.

9     So, in that regard, I found it to be -- to be reasonable,

10     also.

11     Q    Okay.  And -- one moment, please.

12     A    Sure.

13     Q    Now the additional parcel issue.

14     A    Uh-huh.

15     Q    We have 14 acres out of -- and I'm summarizing what I

16     believe you said.

17     A    Sure, sure.

18     Q    We have 14 acres out of 18, which is what the dwelling

19     sits on, correct?

20     A    Yes.

21     Q    And is it roughly four acres or four acres that is in

22     addition to that?

23     A    No.  There's another large parcel, which I -- I cannot

24     historically find out how this was added.  If you -- if you

25     look at the deed, it appears as though the developer decided

1    not to sell this as a buildable lot; and, instead, it got

2    attached to one of the other properties as a -- so there's a

3    --

4    Q    When you say "one of the other properties," do you mean

5    the subject property, somehow?

6    A    Yeah.  I'm not sure.  You know, there's no way -- the

7    developer, I couldn't find any information on them.

8         So, typically, when a developer is -- is working on --

9    and this isn't, you know, a neighborhood were all of it's on

10   third-acres and all the houses are piled on each other.  But

11   there was a developer that developed all these houses in the

12   area.  And typically, when they -- when they get down to the

13   end and nobody wants a certain lot, they'll sometimes simply

14   attach it.  I mean, I've seen something as odd as a populated

15   urban neighborhood where there's a fifteen-acre parcel that

16   is just added to another one, and it's just because they

17   don't know what else to do with it, so it becomes kind of a

18   tagalong --

19   Q    How much --

20   A    -- so to speak.

21   Q    How many acres is that?

22   A    That is approximately 13 acres.

23        And I do have -- and it's in the report is -- and I

24   broke it down into two different views.  But you can actually

25   see the same thing that I have on an additional page in here.

1        So that is what I would consider excess land.  In the

2    appraisal world, there's a term that's called "excess land."

3    And what is that, is essentially determined is a plot of land

4    that's independent from the main parcel, has its own parcel

5    number, but does not contribute anything to the value of the

6    property, but -- and also could be sold off of the property.

7        Now these happen to be on the same deed, but there's

8    nothing that is prohibiting exercising and getting rid of

9    this thirteen-acre parcel if they wanted to.

10       I walked the parcel and, as I mentioned earlier, the 14

11   acres is really where everything of this home is.  There's a

12   -- there's a family garden, all of that exists on the 14

13   acres.  You have to exit the rear of the property, and it's a

14   bit of a downhill grade, to get into this land that was

15   simply heavily wooded.  And I was on just a crude walking

16   trail in order to get there.  It's -- it's not anything

17   that's going to be used for, you know, whether it be

18   activities, things like that.  You won't build on it,

19   necessarily, if you're the subject property because

20   everything is up top on the main parcel, so you wouldn't put

21   a garage down there or anything like that.

22   Q    Is there a tax burden on the extra land?

23   A    There is.  It's all combined into the total property

24   taxes.

25   Q    So it is included.

```
 1   A    Yes.

 2   Q    And when you said -- did you use the non-usable or --

 3   what phrase did you use about the --

 4   A    When I was speaking?

 5   Q    Yes, when you were speaking.

 6   A    Yes, "excess land."

 7   Q    Okay.  And so is it correct to say that, presumably,

 8   that could be -- you had said that could be sold off?

 9   A    Correct.

10   Q    But you would have to -- you'd have to go through and

11   subdivide.

12   A    Well, I actually got into the zoning.  And I'm not an

13   attorney, so I do not do this professionally.  But in regards

14   to the minimum acreage that would needed to be allowed, per

15   zoning, this -- this qualifies for that.

16        Now it does have the problem because it's completely

17   landlocked, and I think that's why this was added kind of

18   onto this parcel.  You know, it's -- but you know, it could

19   be sold off, and then a potential buyer could always, you

20   know, pursue getting an access, you know, some sort of a road

21   access --

22   Q    Are you saying --

23   A    -- amenity.

24   Q    -- when it was added on, there was no easement provided

25   --
```

1    A    No, not to that property.

2    Q    -- whatsoever?

3    A    No.

4    Q    Okay.  Is it more of a burden than it is a benefit, in

5    your -- as you're appraising the property, as you're

6    describing it to somebody?

7    A    I think so because it's -- it's not going to appreciate

8    in value like a vacant parcel that has an easement or direct

9    access to a road.  In that area, which is known as like the

10   Newmanstown/Robensonia, that area is known for incredibly

11   high land prices.  But I did include land comparables when I

12   discussed the extra parcel; and, if it's landlocked, it

13   suddenly plummets.

14       So it becomes something that, you know, you have to

15   maintain, to some degree, not a lot because it's just heavily

16   wooded.  But you know, you would have to worry about security

17   of people, you know, approaching to get in there for hunting

18   or anything, you might have to post it, in order to keep

19   people off of it because it's a rural area, et cetera.

20   Q    So there's a liability issue, as well, potentially?

21   A    Potentially.  I mean, depending, if you don't post it

22   and somebody comes in there and has an issue.

23       It's very hard to see, from up top at the main parcel,

24   so it's not exactly like you're going to be aware.  If you're

25   looking out the back of the house, you cannot see this land

```
 1    because there's immediate trees behind the -- the dwelling

 2    until you get to that other parcel, which you can see from

 3    the satellite views.

 4    Q    Now under "subject property," which I have up here, this

 5    property is 36 years old, correct?

 6    A    Uh-huh.

 7    Q    And what does "effective age of 20" mean?

 8    A    Effective age is -- so you have the actual age of a

 9    house, is when it was built.  So it was built 36 years ago.

10    The effective age is if you have any kind of remodeling, what

11    is -- what is the -- the age of use of the house.

12    Q    Is the effective age of the comparables taken into

13    account, as well?

14    A    Yes.

15    Q    Okay.

16    A    That's where you come in with a -- like a condition

17    rating.

18    Q    Is the acreage total -- so we have 14 and 13, correct?

19    A    Yes.

20    Q    So is it -- so, on this deed, we have 27.

21    A    Yes.

22    Q    Okay.

23    A    And I will say that the parcel records for this property

24    are an absolute mess, which Berks County does not always have

25    the most accurate data, but they have anywhere for nine acres
```

1    for one parcel.  So I actually had to take the -- the entire

2    plots are on the deed, so then I put that into a tract

3    blotter, in order to verify the -- the sizes.  And I found

4    that to match what was historically listed on the property

5    when it was -- when it was for sale previously.

6    Q    How much time does -- and I'm going to call this an

7    "average" or "normal" appraisal take, that does not have the

8    issues of condition, not being in a neighborhood, having this

9    convoluted parcel history.  How long does one of those take?

10   Like if I told you to come to Ebersole Road --

11   A    Right.

12   Q    -- in Muhlenberg Township, at Grande Developments here,

13   and do 656 Ebersole for me.

14   A    Typical property for excluding transit for me to get

15   there, I'd usually spend at least an hour on a property,

16   doing the inspection.  Then, it's -- it's a matter of -- of,

17   you know, pulling courthouse data, which will vary a little

18   bit.  By now, almost everything is online everywhere, so

19   that's, essentially, just sitting in my office and taking

20   care of that.

21       And then the comparable search begins, and that's really

22   the meat of it.  You might have another -- you know, an hour

23   and a half tied into background information, which is all the

24   property information, neighborhood information.  And then

25   you're looking at, for a typical house, a comparable search

1    probably being at least two hours for a normal house.

2        And then, kind of wrapping up, then you have to develop

3    adjustments.  Then you have to develop a value

4    reconciliation, where you're -- because, when you're -- when

5    you're done with three comparables, they're never exactly the

6    same value.  You'll have a range, a low end and a high end.

7    And you're trying to figure out do you have any comparable

8    that might get more weight than another one, so you have to

9    go through that.

10        So I would say, on a typical house, I spend probably

11    about six hours.

12    Q    Uh-huh.

13    A    And this was not typical.

14    Q    And how many hours -- my follow -- natural followup then

15    is:  How long did you spend on this appraisal, all in?

16    A    I'm guessing probably about 10 to 12, until you start

17    the comparable search of just -- like I said, it's starting

18    with a radius, seeing if there's anything in there, expanding

19    your radius, throwing out different properties that just

20    don't make sense, trying to do, you know, histories of

21    properties to see, you know, where they might fail.  So it's

22    -- whenever you have a unique property in a rural area, it's

23    a -- it's a difficult assignment.

24    Q    Okay.  Now I'm going to take you -- let me see what I

25    have it marked.  I'd like to show you as Movant Debtors'

1    Exhibit 2.

2    A    Okay.

3    Q    Did there come a time when I asked you to provide any

4    additional information after the initial appraisal was

5    complete?

6    A    Yes.  You contacted me to see if I would do an update to

7    see if anything had changed in the value.

8    Q    And that was how long after the initial appraisal?

9    A    It appears to have been three months --

10   Q    Do you remember --

11   A    -- approximately.

12   Q    -- why I asked you that?  Three months later?

13   A    Yes.

14   Q    And do you remember why I asked you to do that?

15   A    I do not, other than wanting to know if the value had

16   changed in any way.

17   Q    Okay.

18   A    It -- we are in a market where, you know, some things

19   are moving, you know, faster than others.  Obviously, the

20   last few years have been a really good market.

21   Q    And was that a time, June through September of '24, when

22   values were going up, down, or stagnant?

23   A    I would say, in 2024, values have begun to stabilize, is

24   how I describe it.  It's -- it's very difficult to determine

25   when you have so few sales, so we're -- we're kind of locked

1    in.

2         I've been doing this 20 years.  We're in a phenomenon

3    that's fairly interesting.  So, since COVID occurred, you

4    know, you have this incredibly short supply.  So it's

5    difficult to kind of see how trends are moving because, when

6    you go to pull an area's -- like say I chose Heidelberg

7    Township, and I want to do -- run some stats quick, to see,

8    you know, if I want to go six months earlier and see has the

9    -- has the predominant value changed much, you have so few

10   sales that might only have five houses in my stats.  And then

11   you can't really rely on what that data is telling you

12   because you have such a small, you know, sample size, so you

13   have to take that into account, too.

14        So I, typically, as of right now, I'm saying that prices

15   appear to have stabilized.  You're starting to see days on

16   market extend from '24 into 2025, et cetera.

17   Q    Now what were the results of my request for an update?

18   A    I did not see a change, and that would not be atypical

19   over a span of three months, and for what I just described.

20   Typically, I don't have enough sales to even run market

21   statistics --

22   Q    Did --

23   A    -- to try to --

24   Q    Did you, in this case, have -- redo those statistics, to

25   see if you can get -- find anything?

1    A    Yes, I -- what I do, essentially, if I'm asked for an

2    update from a lender or from -- from an attorney client,

3    would be to go back into the -- the MLS and -- and look to

4    see if there's any, you know, new comparables or comparables

5    that I missed previously.

6    Q    All right.  Now what I'd like to do next is take you to

7    Movants Debtors' Exhibit 3, which is is, as you'll -- now what

8    is the date of -- well, first of all, is this an update, what

9    you're seeing there --

10    A    Yes.

11    Q    -- from February?

12    A    Yes, that is an -- an update of the report as of

13    February 4th, 2025.

14    Q    So this is the second update.

15    A    Correct.

16    Q    And you performed -- did you perform the same --

17    A    Same as always, yes, standard comparables search to see

18    if -- if there was anything new and compelling to add into

19    the report.

20    Q    Did your value change?

21    A    It did not.

22    Q    Okay.

23    A    And once again, that would not be atypical for the span

24    of time.

25    Q    And did you sign off on this valuation?

1   A     I did.

2   Q     Now I want to take you to --

3           MR. TIDD:  lease let the record reflect this

4   exactly the same as appraisal number one, with the addition

5   of 2, Exhibit Number 2, the addendum in there, as well as

6   what I'm going to get into now.

7   BY MR. TIDD:

8   Q     Now let's talk about online valuations.

9   A     Sure.

10  Q     Okay?  Now would you read where it says "Zillow"?

11  A     Sure.

12           "The appraiser was requested, on February 4th,

13           2025, to provide an opinion on the Zestimate" --

14       Which is Zillow's proprietary online estimating service,

15  for anybody that is not aware.

16           "-- value for the subject property, found on

17           Zillow.com, a website commonly used to estimate

18           residential property values.  This value is

19           currently 769,300.  It is my opinion that this

20           value estimate is overinflated to the current

21           market value of the subject property.  In the

22           appraiser's experience, the Zillow proprietary" --

23       Excuse me.

24           "-- the Zillow proprietary algorithm is most

25           accurate in homogenous markets.  The subject is not

1           from such an area."

2       Across Heidelberg Township, the range in sale, which

3   would reflect back to the neighborhood, was, I believe,

4   50,000 to $850,000.  So that goes on to a second page I can't

5   see.

6   Q    Okay.  I can get that for you.

7   A    Sure.

8   Q    Go ahead.

9   A           "The range in sale values is from 50,000 to

10              850,000, with a very wide variety of dwelling

11              styles and lot sizes; thus, it is very difficult

12              for the algorithm to be accurate when applied to

13              any specific property.  While I don't know the

14              specifics of the algorithm, it is also very

15              possible that Zillow has inflated the subject

16              property's value by utilizing properties with

17              acreage that may be farms or tillable acres with

18              rental income, while the subject only has heavily

19              wooded land with no such opportunities."

20  Q    So are you saying that there's a difference between

21  somebody grabbing information for 26 acres --

22  A    Uh-huh.

23  Q    -- that's all 26, no partial shenanigans -- can do

24  something with it, versus 14 plus 13 --

25  A    Uh-huh.

1    Q    -- that you can't really do --

2    A    There's --

3    Q    -- much of anything with?

4    A    There's a type of property known in this area,

5    especially in the Newmanstown/Robensonia area, known as a

6    "farmette."  So you're not a full-blown, commercial farm,

7    where you might have hundreds of acres, but there's hobby

8    farms, is probably how it's best described.

9         So you might have -- you know, you've got your chickens,

10   goats, maybe some sheep, you know, maybe a head or two of

11   cattle.  But essentially, you know, these properties will

12   often come with -- such as like a bank barn, along with the

13   acreage.  And you know, it -- it's really a completely

14   different type of property because people, you know, are --

15   are looking for that hobby farm lifestyle, I would say.

16   Q    Are you saying that the Zillow algorithm, the human-less

17   means of doing things, doesn't grasp the difference between

18   the subject property and something that just has a combined

19   26 acres?

20   A    To my knowledge of what I can figure out when I'm

21   looking at it -- and to be honest, I don't have -- I don't

22   even know how long Zillow has been doing a Zestimate.  But

23   what I do know is it's becoming more common, especially with

24   lending assignments, where, you know, lenders are -- are

25   looking at different online valuations in order to try to

1  help back up and -- and, you know, kind of view an appraisal

2  report, which I have zero issue with.

3      What I continue to see is that these only work in areas

4  -- for example, if we're in Reading and I have a property

5  here in the city, I would expect Zillow to be very accurate.

6  I would, you know, oftentimes use that as a way to self-

7  critique myself, to see if I'm different from that by, you

8  know, a degree of -- of error, do I need to go back and look

9  at it.

10      When you get out into these rural markets -- and I have

11  this discussion with clients all the time, I just had it the

12  other day in -- in Pine Grove, which is up in Schuylkill

13  County, and they -- I'm asked all the time is Zillow

14  accurate.  And what I have to tell them is what I'm

15  explaining now, once you get into a rural area, all bets are

16  off because I don't believe the algorithm takes into account

17  what the type of property is.  I don't even know if it

18  distinguishes between commercial and residential, to be

19  honest.

20      So you have -- you know, if I'm in a rural area and I

21  get a Zestimate contact from a lender saying hey, we have an

22  online estimate of this, rarely do -- you know, if I know the

23  area, do I give it a whole lot of credibility because I just

24  know that Zillow can't do that yet.  You know, they're not on

25  the ground, walking properties.  Once they start doing that,

1    it might be different.

2    Q    And did you say that those Zestimates do not -- are not

3    accepted for purposes of lending?

4    A    No.  In fact, if you, typically -- so you have -- Zillow

5    has their proprietary Zestimate.  Then you have, for example,

6    Realtor.com will do an estimate.  You'll have Redfin, you'll

7    have PennyMac, you'll have Bank of America.  There's a lot of

8    them out there right now.

9        And typically, if you pull up any property and -- and on

10    each one, you're going to have a range of values probably

11    wider than the adjusted range in an appraisal, for sure.  So

12    they're -- they -- they don't even kind of agree with each

13    other.

14    Q    Now, on that topic, did you have an opportune -- the

15    opportunity to review what was submitted as an exhibit by

16    trustee's counsel as the CMAs --

17    A    Yes.

18    Q    -- for the subject property?

19    A    I did.

20    Q    Now you just mentioned different online sites having a

21    wide range.

22        Did you come across anything like that with respect to

23    the CMA you reviewed?

24    A    I did.  I -- I pulled one of the properties and I pulled

25    it because it was the one that sold for the -- for the most,

1    it sold for 1.5 excess million.

2    Q    What's the address of that property?

3    A    That was 85 Vera Cruz Road in Reinholds.

4    Q    And was that included in the comp in the CMA?

5    A    It's a -- if it's -- if they're called "comps" in a CMA,

6    yes.

7    Q    And what was the value of that?

8    A    The value that sold on -- hold on one minute while I

9    grab that.  I believe it was 1.5 and some change.

10   Q    That was sold --

11   A    It sold for 1.595 million.

12   Q    And how many other sites were you able to find that

13   property on?

14   A    I wasn't able to locate it on all of them, but the

15   different ones I just explained.  You had, from PennyMac,

16   they estimated the value of the property at 469,994.  Then

17   this one is Bank of America estimated it at 548,749.  Then

18   Realtor.com valuated it at 831,000.  And then Zillow valuated

19   it at 1,617,500.  So you have a spread of $1.2 million

20   between the different online estimating services.

21   Q    Same exact property.

22   A    Which -- same exact property.  It matches with bedroom

23   count, bathroom count.  And this just goes -- and I don't

24   even -- I have no ill will towards those services, they just

25   -- they struggle where they struggle and they're great where

1    they're great, and it's important to realize the difference.

2    Q    So they have their place, just not here.

3    A    Correct.  Not in rural areas yet, I will say.

4    Q    Okay.  And is the time that you and I spent on this

5    property in total less than average, average, more than

6    average, a lot more than average?

7    A    Working on this appraisal?

8    Q    Yes.

9    A    More than average.

10   Q    Okay.

11   A    I keep my fee the same, but this one was more difficult.

12   I don't --

13   Q    You --

14   A    -- change my fees based on difficulty.  I -- I take the

15   assignment, whatever it ends up being it's -- it is.

16   Q    And payment comes directly from the debtors?

17   A    Yes.  That came on the day of the inspection of the

18   property, which was the June 29th.

19   Q    Okay.  And the amount?

20   A    Three hundred.

21   Q    Okay.  And that's not contingent on anything, correct?

22   A    No.  I would say it's -- it's less than I get for a

23   lending assignment, and the reason for that is I -- I simply

24   do a condensed form for -- for any private use.

25        Lending has these long forms, which is are codified with

1    C codes, Q codes.  So I use just a simply different kind of

2    form, which allows me to simply, you know, condense it, where

3    it's a lot more user friendly for everybody involved.

4    Q    Okay.  And just to be clear, we started in June of 2024,

5    and we didn't finish looking at this property until February

6    --

7    A    Correct.  With --

8    Q    -- of 2025.

9    A    -- gaps in between.  With periods --

10   Q    Yes.

11   A    -- of no discussion whatsoever.

12           MR. TIDD:  I have nothing further, reserve the

13   right to redirect, if necessary.

14           THE COURT:  Okay.

15           MR. TIDD:  Thank you.

16           THE COURT:  Mr. Seitzer?

17                      CROSS-EXAMINATION

18   BY MR. SEITZER:

19   Q    Good afternoon, Mr. Achenbach.  You testified that

20   you're a certified Pennsylvania real estate appraiser.  Is

21   that correct?

22   A    Yeah, for residential only.

23   Q    For residential only.

24           And who are your typical clients?

25   A    My typical clients would be -- I carry several preferred

1      lenders that I do work for, and then I also am open to

2      private clients, which would be various attorneys, for

3      estates, divorces, different things like that.  I would say

4      the bulk of my work are -- are lending assignments.

5      Q    And do you specialize in any specific county in

6      Pennsylvania?

7      A    I do three primary counties, which are Lebanon, Berks,

8      and Schuylkill.  And then I'll also do a little bit of

9      Lancaster County, depending on my time availability and where

10     the property is.

11     Q    So how many appraisals do you think you've done over --

12     I believe 20 years, right?

13     A    Yes.

14     Q    In Berks County.

15     A    In Berks County?  Hundreds.  I would have picked up

16     Berks -- I started, primarily, in Lebanon and Schuylkill, and

17     I opened up to Berks, times flies, so I -- time flies.  I

18     would probably be doing Berks County maybe the last seven,

19     eight years.

20     Q    Okay.  And was it your testimony that the 13 acres,

21     which is not the land where the improvements are --

22     A    Uh-huh.

23     Q    -- has zero value; was that your testimony?

24     A    Not necessarily.  Within the 584,000, I tried to

25     determine what contributory value that provides to the

1    property, which is discussed in the comparables on the -- on

2    the comments addendum.  So it surely could be sold for

3    something; what exactly that is, I don't know.  That wouldn't

4    be realized until it was actually sold.

5        As of right now, sitting on the property, the -- the

6    generation of value to the -- to the whole property is very

7    limited.

8    Q    So what's the number, in your professional opinion, as

9    to that 13 acres?

10   A    If it would be split and sold off as a landlocked

11   property, I have that as approximately 32,000.

12   Q    Is there timber on this property?

13   A    Timber of unknown variety.  I couldn't tell you what's

14   good timber or bad timber.

15   Q    All right.  And would it be possible for hunters to hunt

16   on that land?

17   A    Only if they were able to get some sort of approved

18   access because there is no direct access to the property from

19   anywhere other than the subject property and --

20   Q    But from the subject property, so hunters could use that

21   -- those 13 acres.

22   A    I don't know, necessarily, why you would want to walk

23   down into that grade, when you can simply hunt the acres that

24   are part of the main parcel.  I mean, it's -- it's, you know,

25   14 acres up there with a lot of woods, you know, it gives you

 1    a lot of area to go that's level, without having to do the --

 2    you know, the hiking required.

 3    Q    And it's your testimony there's one deed, but two parcel

 4    numbers.  Is that correct?

 5    A    Correct.

 6    Q    And what vicinity did you search to do the comps that's

 7    in the debtors' exhibit M-1, M-2, and M-3?

 8    A    I expanded out to ten miles.  That's typically the cap

 9    of what I want to do in regards to -- you know, I feel -- and

10    this is my personal opinion and other appraisers may vary.

11    But I feel, once you've exceeded the ten-mile mark, you're --

12    you're kind of out of the immediate market.  I can't say that

13    potential buyers would be -- you know, are spanning 20, 30

14    miles to find a house.  Usually, there's a particular area

15    they want to -- they want to live in and they want to find a

16    house there.

17    Q    And you were only able to find three other houses within

18    this ten miles.  Is that correct?

19    A    Yeah.  And that is pretty typical in this market.  Yes.

20    Q    And the subject property, the property at 815 Texter

21    Mountain Road, that has a complete, full basement, correct?

22    A    It does.

23    Q    And bedrooms and bathrooms and things along those lines?

24    A    Yes.

25    Q    And your other comparable properties do not, correct?

1    A    Comparable one did, that had a family room in the

2    basement.

3    Q    Right.  But no bedrooms or bathrooms or things along

4    those lines.

5    A    Correct.  I would find that bedrooms and bathrooms in a

6    basement are less desirable than above grade.  Really,

7    everything below grade is typically adjusted at a different

8    scale because, you know, the use.  You will typically have,

9    you know, materials that are a little less quality down

10   there; you might shift from drywall to maybe like suspended

11   ceilings.  You have kind of the below grade feeling, where

12   you don't necessarily have the amount of natural light that

13   comes in.  So, you know, usually, these are expanded on a --

14   on a per use basis by the homeowner itself and may not

15   transcend to other owners, depending on their needs.

16   Q    All right.  So, if you count the basement bedrooms and

17   bathrooms, the subject property has more bedrooms and

18   bathrooms than your three comparable properties.  Is that

19   correct?

20   A    Let me take a look here.

21        If you wanted to consider it having five bedrooms.  Like

22   I said, they may be used as dens, they may be used as sewing

23   rooms downstairs.  You -- you know, they were happened to be

24   used as bedrooms, so that's -- therefore, that's what they

25   were called.

1    Q    All right.  And the subject property, as you testified,

2    two separate parcels, one approximately 14 acres, one

3    approximately 13 acres.  That's a lot of acreage, compared to

4    your comparable properties.  Is that correct?

5    A    It is.

6    Q    Like triple --

7    A    Though --

8    Q    -- or quadruple, five times.

9    A    It is.  But once you exercise the acknowledgment of the

10   excess land, you know, it's -- it's, you know, down to the --

11   essentially, the 14 acres of the -- of the subject primary

12   parcel is where all the -- the living and events and

13   everything are going to be, you know, taking place.

14   Q    And you testified that you're not a real estate broker.

15   Is that correct?

16   A    I am not.  Correct.

17   Q    And you were never a real estate broker?

18   A    No.

19        MR. SEITZER:  Your Honor, I have no further

20   questions.  Thank you.

21        THE COURT:  Do you have any redirect?

22        MR. TIDD:  Nothing on redirect, Your Honor.

23        THE COURT:  Okay.  You can step down.  Thank you.

24        MR. TIDD:  Reserve --

25        THE WITNESS:  Okay.

1              MR. TIDD:  -- the right --

2              THE WITNESS:  Thanks.

3              MR. TIDD:  -- to recall for rebuttal.

4              THE COURT:  Okay.

5          (Witness excused)

6          (Participants confer)

7              THE COURT:  Mr. Tidd, is there anything else that

8      you would like to present?

9              MR. TIDD:  Yes.  I would like to call, first --

10     excuse me -- Ms. Wendy Swartz.

11             THE COURT:  Okay.  Ms. Swartz, come on up.

12             THE ECRO:  Please raise your right hand.

13                   WENDY MAY SWARTZ, DEBTOR, SWORN

14             THE ECRO:  State your name and spell your whole

15     name for the record.

16             THE WITNESS:  Wendy Swartz, Wendy, W-e-n-d-y,

17     Swartz, S-w-a-r-t-z.

18             THE COURT:  You can have a seat.

19             THE WITNESS:  Thank you.

20             MR. TIDD:  Good morning.  Thank you, Your Honor.

21                         DIRECT EXAMINATION

22     BY MR. TIDD:

23     Q    Ms. Swartz, when did you first come to see me?

24     A    That was back in 2024, May.

25     Q    If that's what you say, that's what you say -- what you

```
 1    say.

 2    A    Well, I have to look.  It was around --

 3    Q    I'm okay with it.  Let's ...

 4         (Laughter)

 5    Q    Okay.  And for reason did you come see me?

 6    A    To apply for bankruptcy and get more information on our

 7    options.

 8    Q    And did you come alone?

 9    A    Yes, the first time.

10    Q    And who did you tell me that the bankruptcy would be

11    for?

12    A    Myself and my husband.

13    Q    Okay.  And can you identify your husband, please?

14    A    Dennis Swartz.

15    Q    Thank you.

16         Now are you employed?

17    A    No.  I'm a medically retired RN for disability.  I have

18    multiple sclerosis.

19    Q    Okay.  And what do you -- do you receive any SSD, any

20    pension?

21    A    I receive Social Security disability.

22    Q    Okay.  In what amount?

23    A    Approximately 2,400 a month.

24    Q    Is that your sole -- is that your individual source of

25    income and contribution to the household?
```

1    A    Correct.

2    Q    All right.  Now is the home one story, two story,

3    single-level living?  What's -- how would you describe it?

4    A    It's actually a main floor, upper and lower.  We made it

5    a single-story living; health-wise, we need that.  But it

6    does have an upstairs and downstairs and -- yeah, so it's

7    main living for us, with the main -- our bedroom, bathroom,

8    living room, and kitchen is the main floor.

9    Q    And why do you, yourself, require that type of living

10    arrangement?

11    A    With the MS, I do have flares at times.  And one of my

12    most predominant flares is inability to walk.  My right leg

13    first gives out, then my left, so I cannot do stairs all the

14    time.  It takes me awhile sometimes, when I get up and move,

15    to do steps.  I didn't want a bedroom on another floor, where

16    I'd have to do steps right off the go.

17        And also, for bathroom access, with MS, I also do suffer

18    from incontinence, and so having a bathroom there, the living

19    arrangement is what we needed, that.

20    Q    Okay.  Now, when you came to see me in May, did I bring

21    up any potential issues that your case might have?

22    A    Yes.

23    Q    And what were they?

24    A    The -- the value of our home.

25    Q    Because?

1    A    If -- if it was high enough and had too much equity,

2    we'd have to look at a 13, versus a 7.

3    Q    Okay.  And then what was my recommendation we do about

4    finding out the value of the property?

5    A    To get an official appraisal before we proceeded with

6    either deciding on 7 or 13.

7    Q    And what was -- were there any other issues we had to

8    talk about?

9              MR. SEITZER:  Your Honor, Mr. Tidd is getting

10   awfully close to having his client waive attorney/client

11   privilege here.  I --

12             MR. TIDD:  Your Honor, there's no other -- well,

13   first of all, there's nothing that she could possibly say

14   that would -- if I was trying to hide corruption on here, for

15   sure I'd be worried, but I'm not.

16             THE COURT:  Not --

17             MR. TIDD:  And that's an objection for her to make.

18             THE COURT:  She may not know to make it.

19             MR. TIDD:  I was going to say --

20             THE COURT:  So --

21             MR. TIDD:  -- or Your Honor --

22             THE COURT:  -- why don't you --

23             MR. TIDD:  -- to make it for her.

24             THE COURT:  Why don't you at least explain to her

25   what --

1      MR. TIDD:  Yes.

2      THE COURT:  -- the implications are of talking

3  about what the two of you have spoken about.

4  BY MR. TIDD:

5  Q    Do you know what "attorney/client privilege" is?

6  A    That we can talk and know it's confidential between us?

7  Q    Yes.

8  A    Okay.

9  Q    Now I'd like to make you aware --

10     MR. TIDD:  Now I'll be making a statement, of

11  course, Your Honor, but --

12     THE COURT:  Understood.

13     MR. TIDD:  -- I'd ask for a little bit of latitude.

14  BY MR. TIDD:

15  Q    If you -- if I ask you questions about what you told me

16  and what I told you, what that would do is that could waive

17  attorney/client privilege about your whole case.

18     Is there anything you would have possibly told me that

19  you wouldn't want to be known about this case?

20  A    No.  I -- no.

21  Q    Do you voluntarily waive the privilege for the purpose

22  of this hearing?

23  A    Yes.

24  Q    Okay.

25     THE COURT:  Okay.

1          MR. TIDD:  Good?

2          THE COURT:  We can proceed.

3          MR. TIDD:  Okay.

4          THE COURT:  Uh-huh.

5     BY MR. TIDD:

6     Q    What else did we talk about, if anything, that I thought

7     might have been a concern, or that you thought was a concern?

8     A    Oh, gosh.  Well, I got -- asked the difference between

9     the 7 and 13, got information.  You explained the home

10    values, and that would be our main deciding factor.  Oh, and

11    also, we were not -- we wanted 100 percent to be sure,

12    because of his VA disability pay, how that factored into

13    income --

14    Q    All right.

15    A    -- because there was different stories out and different

16    things we were told.

17    Q    And what did I, ultimately, tell you about your Social

18    Security benefits and the VA disability?

19    A    That, under the Safe HAVEN Act and with the disability,

20    they cannot be counted as accessible income.

21    Q    Okay.  Now -- pardon me.

22         You've stated that the home works for you as a single --

23    for single-level living, correct?

24    A    Yes.

25    Q    Okay.  And --

1          MR. TIDD:  One moment, Your Honor.  I apologize.

2          (Pause in proceedings)

3     BY MR. TIDD:

4     Q    How many other visits did we have, either individually

5     or with your husband, to discuss the case?

6     A    At least five.

7     Q    Any telephone conferences with all of us?

8     A    They were held to minimum, but yeah, there was a few,

9     just single questions answered during phone calls.

10    Q    And did we review everything that was in the petition?

11    A    Yes.

12    Q    How many times did we review everything that was in the

13    petition?

14    A    At least twice extensively, and then it might have just

15    been referred to in the other calls.

16    Q    Okay.  Did we review it also in person?

17    A    Yes.

18    Q    And did you sign in person?

19    A    Yes.

20    Q    Okay.  Now, if you were to be granted leave to file a

21    Chapter 13, is there any income from which you could pay into

22    a Chapter 13?

23    A    Yes.

24    Q    And what would be that source?

25    A    My disability.

1    Q    Okay.  Or any of the disability, but yours specifically,

2    you could contribute some to?

3    A    Yeah.  Yeah.

4    Q    Now, if the house was forced to be sold, what would the

5    impact be on just you for now?

6    A    Sorry.  Just hearing those words are upsetting.

7         Nothing that was ever in my thought process, to get rid

8    of the home.  We have fought to kept it -- keep it.

9         Also, my husband, his dream was always to own land

10   somewhere.  And when he was diagnosed with cancer and we were

11   told it was incurable, we said we either make the change to

12   get him land now or might not have the chance.  So we bought

13   this property in -- nine years ago and turned it into what we

14   needed by adding a bathroom to the main floor at the bedroom,

15   and so we could have one-floor living.

16        And knowing that, with my MS and his cancer, our life

17   expectancies may not be as great as they could, our plan was

18   to have our son help us with what he liked at the house and

19   help make some decisions in making the property better, so

20   he, eventually, could take over the house when we passed.

21   Q    Where --

22   A    So it is a family -- it's a family property we created.

23   Q    Where would you go if you had to go?

24   A    I have no idea.  I want to say with the price of homes

25   right now, I don't know what we could afford with our

1    disability income.

2              MR. TIDD:  And I'd ask for a little latitude with

3    respect to speculation, Your Honor.

4    BY MR. TIDD:

5    Q    What do you think having to leave would do with respect

6    to your condition?  Would --

7    A    Oh, well --

8    Q    -- one make the other worse, back and forth?

9    A    Well, MS is -- is exacerbated by stress, obviously, so

10   it would have an ill effect on my health that way.

11         Also, we are living now in an area where we have doctors

12   spanning from Lancaster General, Reading Hospital, a

13   specialist at Penn, so we are at a central location now,

14   where we can get to all of our doctors in a reasonable amount

15   of time, and we're close to the lab for lab draws.  And that

16   stuff all took into account where we live.

17   Q    Okay.

18   A    So, yeah, it -- plus, just not knowing where we'd live

19   and the condition.  We had to make sure, when we moved in,

20   there was no mold because my immune system and his immune

21   system is low.  We had to do some extra checks to make sure

22   it was a safe home that we could live in.

23   Q    Now do you recall me telling you -- or what I had said

24   at the end of the 341 meeting about how I thought things had

25   gone?

```
 1    A    Three -- the one we just -- I'm sorry.  The one we had

 2    with the --

 3    Q    The video conference.

 4    A    Oh, at -- at the end of it, she said I'll consider this

 5    case closed for good, and we said, I believe, everything is

 6    settled, we're good -- we -- you'll hear from me if any

 7    issues, that was it.

 8    Q    Okay.  And did I have the opportunity or the chance to

 9    call you later, days later?

10    A    Yeah.

11    Q    And what did I tell you; what did I inform you of?

12    A    That -- I guess -- that -- I'm trying to remember

13    exactly.  I knew, somehow, that there -- I don't -- I forget

14    the wording, but that yes, there was an issue and we had work

15    that had to be done.

16    Q    Okay.

17    A    I was a little -- I thought it was done at that point,

18    so I kind of ...

19    Q    They didn't give you any further details, correct?

20    A    I don't think so, no.

21    Q    Okay.

22         (Participants confer)

23              MR. TIDD:  I have nothing further at this time.

24              THE COURT:  Okay.  Mr. Seitzer.

25                        CROSS-EXAMINATION
```

1    BY MR. SEITZER:

2    Q    Good morning, Ms. Swartz.

3         Let's just talk briefly about your income and expenses.

4    You indicated that you receive approximately 2,400 a month in

5    Social Security.  Is that correct?

6    A    Correct, sir.

7    Q    And do you know what your husband receives on a monthly

8    basis?

9    A    He receives approximately the same, Social Security

10   disability, and then the thirty-nine, as stated earlier, for

11   the VA disability, military.

12   Q    And I apologize, I wasn't aware of this, the VA

13   disability issue, until Mr. Tidd mentioned it.

14        So what's on the schedules is just a portion of what

15   your husband gets for this VA disability, correct?

16   A    Correct.  And that was only to bring it to a level zero

17   for spending, yeah.

18   Q    So he receives, on a monthly basis, besides the 2,400

19   Social Security disability, he also receives 3,900 for the VA

20   disability.  Is that correct?

21   A    That's correct.

22   Q    And how much do you think you have left over every

23   month, after you receive your Social Security, your husband

24   receives his Social Security disability, as well as the VA

25   disability; how much do you save on a monthly basis?

1    A    I'd have to ask.  Do you mean -- and --

2    Q    I mean, after you have your -- all -- after you receive

3    your income --

4    A    No, no.

5    Q    -- and your husband's --

6    A    I understand that.

7    Q    -- income --

8    A    What I'm saying is do you mean prior to filing dis --

9    filing -- prior to filing bankruptcy?

10   Q    No.  As of today, let's say.

11   A    As of today, I'd say almost a thousand maybe, but after

12   groceries and that stuff, though, I'm not even sure.

13   Honestly, I -- the past few months, I've had maybe 150 to 200

14   left in my checking, after groceries and normal stuff of the

15   month.

16   Q    When did your husband receive this VA disability

17   payment.

18   A    His --

19   Q    When did he start getting it?

20   A    His cancer was diagnosed in 2015.  It took about a year

21   to get the disability.  And the doctors had to show that it

22   was eventually terminal, that it was stage four, there was no

23   treatment to make it better, which took about a year.

24   Q    So he's been --

25   A    And --

1   Q    Just to make it easy.  So he's been receiving it for

2   some period of time.

3   A    Correct.

4           MR. TIDD:  Your Honor, can I have an offer of

5   proof, please?

6           THE COURT:  With respect to?

7           MR. TIDD:  The disability payment history.

8           THE COURT:  I don't know that -- I mean, I think

9   it's fair game.

10          MR. TIDD:  Okay.

11          THE COURT:  We're talking about income coming into

12  the household, so I think you can ask that question.  Whether

13  she knows the answer to that is up to her, but I --

14          MR. TIDD:  Withdrawn.

15          THE COURT:  -- don't have a problem with the

16  question.  Okay.

17  BY MR. SEITZER:

18  Q    So just to ask you the question again, as to your --

19  this is -- you know, to the best of your knowledge, would you

20  norm -- would you ever have more than a thousand left over

21  every month, currently, after you pay all of your expenses?

22  A    I mean, the -- the potential is there.  But I will tell

23  you that some -- I needed a seven-hundred-dollar crown this -

24  - like, every time I think I have almost a thousand,

25  something comes up.  It's time for an oil change, it's time

```
 1    for a crown.  I have two more crowns that I've been

 2    postponing because I can't afford them.  I mean, so,

 3    potentially, if I got nothing of these extra expenditures

 4    that come up randomly, yeah.

 5    Q    But currently, you're not saving a thousand a month and

 6    --

 7    A    No.

 8    Q    -- you're saving like maybe a couple hundred bucks a

 9    month.  Is that fair?

10    A    Not even, not even a couple.  I -- no.  Still trying to

11    just catch up and get things done, our -- that we need done.

12              MR. SEITZER:  I have no further questions, Your

13    Honor.  Thank you.

14              THE COURT:  Redirect?

15              MR. TIDD:  Yes.

16                        REDIRECT EXAMINATION

17    BY MR. TIDD:

18    Q    In the original set of schedules -- excuse me -- we had

19    an excess of $2,451.27.  Was that correct at the time?

20    A    Yes.

21    Q    And why is it different now than then?

22    A    Well, no, that isn't -- well, I'm going to say I guess

23    it's not -- that is a total excess after all direct bills are

24    paid.

25    Q    Okay.
```

1    A    And then that 2,400 after that, that is like the extra

2    stuff we've been paying.  Our heater just died.

3    Q    Okay.

4    A    Our plumbing just went in the kitchen, so --

5    Q    Non-routine expenses?

6    A    Correct.  Correct.

7    Q    And --

8    A    So that --

9    Q    And did we only include -- did we or did we not only

10   include routine expenses --

11   A    Routine --

12   Q    -- on the --

13   A    -- expenses --

14   Q    -- schedules?

15   A    -- only, yeah.

16   Q    Thank you.

17           MR. TIDD:  Nothing further, Your Honor.

18           THE COURT:  Mr. Seitzer?

19           MR. SEITZER:  I have nothing, Your Honor.  Thank

20   you.

21           THE COURT:  Okay.  You can step down.

22        (Witness excused)

23           MR. TIDD:  My next witness, Your Honor, would Mr.

24   Dennis Swartz.

25           THE COURT:  Okay.

1          MR. TIDD:  Thank you.

2          Do you need a minute or can we go through?

3          THE COURT:  No, we're okay.

4          MR. TIDD:  Okay.

5          THE ECRO:  Please raise your right hand.

6               DENNIS LYNN SWARTZ, JR., DEBTOR, SWORN

7          THE ECRO:  State your name and spell your whole

8    name for the record.

9          THE WITNESS:  Dennis Swartz, D-e-n-n-i-s, S-w-a-r-

10   t-z.

11         THE COURT:  Okay.  You can have a seat.  Thank you.

12                    DIRECT EXAMINATION

13   BY MR. TIDD:

14   Q    Good afternoon, Mr. Swartz.

15        Mr. Swartz, you are a co-debtor in this bankruptcy,

16   correct?

17   A    I'm sorry.  Say it again.

18   Q    You are a co-debtor in this bankruptcy, correct?

19   A    Yes, sir.

20   Q    And are you employed?

21   A    No.

22   Q    Were you ever employed?

23   A    Yes.

24   Q    By whom?

25   A    The U.S. Army and the Pennsylvania National Guard.

1    Q    For how long?

2    A    Twenty-eight and a half years.

3    Q    When did that begin?

4    A    In 1987.

5    Q    And when did that end?

6    A    It ended 2015, going into 2016, is when I was medically

7    retired.  And there was an about two-year break in service.

8    Q    What does medically -- does medically retired -- is that

9    something that happens to you or do you medically retire?

10   A    No, it happens to me.  So I got sick.  And when we went

11   to the hospital, it was -- they found cancer.  And then,

12   after my surgeries, and then allowed time to heal from the

13   surgeries, and they got the full diagnosis.  I was deemed not

14   capable of service anymore.

15        So you go through what we call the "medical board" for

16   the Army and the VA, and that's where they establish your --

17   your fitness, whether you can serve or not.  I was found

18   unfit because of stuff they -- the surgeries -- removed from

19   my body.  And that's where they set your disability rating.

20   Q    When you say "removed from your body," what does --

21   what's the reason you were medically retired?

22   A    Cancer.

23   Q    What type of cancer?

24   A    Neuroendocrine cancer.

25   Q    Could you kind of --

1    A    It's --

2    Q    -- make that --

3    A    It's got a couple of different names and it -- it varies

4    from where they actually find the -- the main cancer.

5    Q    Where was yours found?

6    A    So, for me, they found it in my liver, large and small

7    intestine, spleen.  So I had parts of both intestines taken

8    out, the mesentery, which is what holds the intestines

9    together, spleen, lymph nodes.  They tried to go in and take

10   the cancer off my liver, found it was just -- had too much

11   cancer on it, so they took some big -- big chunks out, and

12   then the rest is still there.

13   Q    And what's the -- did you mention the stage it was in?

14   A    Stage four.

15   Q    Is there a stage five?

16   A    No.

17   Q    Is it terminal?

18   A    It is terminal, yes.

19   Q    And did you ever serve overseas?

20   A    Multiple times.

21   Q    Where and when?

22   A    I was stationed out of Hawaii at first.  We went to

23   places that had what we call "austere environment."

24   Q    What is that?

25   A    That -- that would be any place where there's nothing,

1    what we would consider real development, so Thailand,

2    Johnston Atoll, where there was a nuclear weapons fail test,

3    so we were exposed to plutonium that they didn't tell us

4    about.  It's also where they kept chemical and biological

5    weapons.

6    Q    Were you exposed to those, as well?

7    A    Yes.

8    Q    How were --

9    A    You can only --

10   Q    How did --

11   A    -- stay on the island for -- for three days, and then

12   you had to leave because of exposure risk.

13   Q    But they took you there anyway.

14   A    Yes, you had to guard it.

15   Q    Okay.  And you spent those three -- how many of those

16   three-day stints did you do there?

17   A    About four or five that I can remember.

18   Q    Okay.

19   A    And then there's Kosovo and Iraq.

20   Q    Any exposures anywhere else besides the Atoll?

21   A    In -- yeah.  So we would have been exposed to -- I had a

22   burn pit in Iraq not even 50 years to my -- the door to my --

23   my living space, where -- on the little base that we were at.

24   Q    What have they been attributed to with respect to

25   medical conditions?

1    A    Right now, the burn pit is -- I don't know if it's

2    actually passed completely through Congress yet, but they're

3    going through because the number of odd illnesses that have

4    occurred with soldiers, going all the way back to the first

5    Gulf War, with like the burning oil wells and stuff like

6    that.

7    Q    Okay.

8    A    So there's -- I don't know if you can say there's a

9    specific thing.

10   Q    Well, my question was, actually:  Has any of that been

11   attributed to --

12   A    I --

13   Q    -- or has any of your condition been attributed to the

14   burn pits?

15   A    No, not specifically.  I -- I mean, it's all exposure

16   to, and then there's this long laundry list of things like if

17   you think like Agent Orange from the Vietnam era, where

18   there's just thing long laundry list of where we have higher

19   rates of these things.  So, whether the cancer came from that

20   or not, it doesn't matter.  I was considered a hundred

21   percent disabled because I was an active duty soldier when

22   the cancer was diagnosed.

23   Q    So, regardless of all that exposure, which it sounds

24   like you think that it -- the fact that they caught that

25   while you were in the service, means that it's 100 percent --

1    A    Correct.

2    Q    -- attributed to service.

3         Now I'd like to walk you through your income that's been

4    reported in this case.

5         Now I have here, from the Department of Veterans

6    Affairs, March 14th, 2024, this is M-5.  Yes.

7         What is that?  What is what you're seeing there?

8    A    That's our yearly statement.  So --

9    Q    Did you receive this, personally?

10   A    Yes, it comes in the mail.  It's -- it's basically if

11   there's a COLA change, cost of living adjustment change,

12   every year.  It shows what the payments were.  And as you can

13   see there, my --

14   Q    Do you need me to go down?

15   A    No.  So, right there, under the "benefits information"

16   is 100 percent service connected.

17   Q    Uh-huh.  So under "VA benefits information," we have

18   "service connected disability, yes."

19   A    Correct.

20   Q    Is that correct?

21   A    And then it will show, like I said, every fiscal year,

22   if there's a change in -- in the cost of living adjustment or

23   stuff like that --

24   Q    Uh-huh.

25   A    -- it will show that.  And that's what it would have

```
1    been, last year's.
2              MR. SEITZER:  I have a limited objection to this.
3    Perhaps Mr. Tidd can cut me off.  Was this provided to my
4    client before?
5              MR. TIDD:  Every single thing I've had here today -
6    -
7              MR. SEITZER:  Okay.
8              MR. TIDD:  -- was provided to your client.
9              MR. SEITZER:  No objection then --
10             THE COURT:  Okay.
11             MR. SEITZER:  -- Your Honor.  And the point was --
12             MR. TIDD:  Yeah.
13             MR. SEITZER:  -- I didn't see this until this
14   morning.
15             THE COURT:  Okay.
16             MR. TIDD:  Yeah.  And I was prepared to make -- to
17   have a response to any prejudice argument.  All of this was
18   provided, and then some, of course.
19             MR. SEITZER:  No objection then --
20             MR. TIDD:  No, no.
21             MR. SEITZER:  -- Your Honor.
22             MR. TIDD:  I understand.
23             MR. SEITZER:  I just haven't seen it --
24             MR. TIDD:  Yeah.
25             MR. SEITZER:  -- before.
```

1  BY MR. TIDD:

2  Q    Now is the amount correct?  The current monthly award

3  amount is?

4  A    Correct.

5  Q    And that's as of now.

6  A    Correct.  I'd have to check.  I -- I don't know if

7  there's been an update, but yeah, I think it is.

8  Q    This was --

9  A    I think we have --

10  Q    This was a March 2024 letter.

11  A    Yeah, I -- yes.  Yeah, we haven't gotten a COLA this

12  year.

13  Q    Okay.  Now that's VA disability, correct?

14  A    That is VA disability, yes.

15  Q    As distinct from -- let me get to the next one here.

16       What is what I am showing you right now?  This is M-6.

17  A    So, when you look at that, that's -- that's basically

18  what we call a "leave and earning statement" in the military.

19  That's our pay -- that's our paystub that you get --

20  Q    Okay.

21  A    -- monthly.  And as you see, it will show you the gross

22  pay.  So that is my total retirement for the years of service

23  times -- and rank times three.

24  Q    Okay.

25  A    The VA waiver is the $3,900, so that gets deducted from

1    that.

2         And then the SBP is survivor benefit cost.  So, upon

3    retirement, I elected to pay a monthly fee, so, that way, if

4    I pass before my wife, she will get 50 percent of my

5    retirement check for the rest of her life.

6         And then what's left was after all those deductions, is

7    the taxable income.  So, in terms of like when we file our

8    taxes, that is -- that $426 is what we make.

9    Q    Now is the $426 the portion of your pay that is not

10   attributable to disability?

11   A    Correct.

12   Q    Okay.  And did we, in fact, include that as a sort of

13   pension income or retirement income on your schedules?

14   A    Yes.

15   Q    And that was not exempted under the HAVEN Act, correct?

16   A    Correct.

17   Q    Okay.  Now next is, for you, we have a Social Security

18   1099 from 2023, which, of course, we would have used for 2024

19   earnings.

20        Does that reflect your benefits throughout the entire

21   year for 2023?

22   A    Yes, sir.

23   Q    Okay.  And did you, in fact, provide me with the Social

24   Security deposits that were provided in the year 2024?

25   A    Yes, sir.

1         MR. TIDD:  Okay.  And Your Honor, they were also

2    provided to the trustee.

3    BY MR. TIDD:

4    Q    And your wife's statement is here, correct?  As well.

5    A    Correct, sir.

6    Q    Okay.  Now I want to bring you back to the video

7    conference, the meeting of creditors we had.

8         Did the trustee ask you to explain the sources of all of

9    your income?

10   A    Yes.

11   Q    What did she ask specifically?

12   A    She -- she asked as if it was like a pension check, you

13   know, what bank the -- the check was coming from.  And when I

14   said it was coming from the defense finance agency, the --

15   the government agency, she -- she did not seem very familiar

16   with it, which is not atypical, I'm not --

17   Q    Right.

18   A    -- pointing a finger at her.  But she didn't seem to

19   actually have a full grasp that this is actually not a check;

20   it's my retirement benefit from the Army.  So it goes

21   directly to me from the Department of Defense finance,

22   directed into my account.  There's no bank account for it, so

23   --

24   Q    And did we, at -- the three of us, meaning the trustee,

25   myself and yourself -- did we discuss how the -- the HAVEN

1   Act and its application to your pay?

2   A    Yes.  And again, I don't think she was overly clear on

3   it.  Again, I'm not -- I don't know how to say.  It -- with -

4   - I was left with the impression, and I think I -- I

5   mentioned it, was that, you know, she's got a lot of cases

6   she's running through at a time, and time is a thing.  And

7   with that lack of understanding -- I know you specifically

8   pointed out to her, you actually pulled a page and said it's

9   right here and -- and why.  But I think she just came across

10  as very hurried, trying to, you know, get through the day

11  type of thing.

12  Q    In the end, did she accept our explanation?

13  A    She said yes, yes.

14  Q    Okay.  Now we heard from your wife that you, essentially

15  -- or you have first floor living.

16  A    Yes, sir.

17  Q    Is that -- do you require that?

18  A    I do not at this time.  I'm still able to -- mobile, get

19  around, where -- where her and her legs are -- are much more

20  advanced than -- than me.  My fatigue comes and goes and it

21  depends on how active my cancer is that day.

22  Q    Okay.  Do you still use the second floor at all, or do

23  you utilize the first floor living now?

24  A    I stay on the first floor, mostly.

25  Q    Is it going to be required in the future?

1    A     Yes.

2    Q     Okay.  Do you plan on staying home through the end of

3    treatment and --

4    A     I don't want to be in a home or a hospital bed when that

5    time comes, no.  I would rather be at home.

6    Q     Okay.

7    A     Is that -- was that --

8    Q     Yes.

9    A     -- your question?

10   Q     Yeah.  That's a much more artful way of what I just

11   asked.  I apologize.

12         What impact would there be on you, personally,

13   especially given your condition -- or conditions, I should

14   say, if you had to leave?

15   A     I will tell you it would be mentally bad for me, just

16   because, you know, we started this process, it was just for

17   us, it was just like we wanted to do a bankruptcy.  And to --

18   to lose the home at this stage, I'd be more concerned for my

19   wife than myself.  I mean, I'm used to moving around.  But

20   the -- the goal was to have something I could pass on to my

21   kid.  And it would be a bit devastating to have failed in

22   that.

23   Q     Were you surprised at all by the value that was given to

24   you when I forwarded you -- or Ryan, maybe he personally

25   forwarded it to you, I don't know -- the appraisal.  Did

1    anything surprise you about that?

2    A    The original appraisal or the one after our -- our

3    teleconference with the --

4    Q    The one that we -- that you commissioned, the one for

5    five eighty-four.

6    A    No.  I think that was -- was in -- in line with where

7    the house was.  There's -- there's condition issues with the

8    house.  I mean, it's -- you're on an original septic system

9    that is 30 years that, to replace it, is going to cost quite

10   a bit.  There are dilapidated structures that need to be torn

11   down and disposed of.

12   Q    Like what?

13   A    There's an old cabin, an old cinder block cabin that is

14   completely caved in.  Some of the walls are still standing.

15   The -- the concrete pad that it was on is -- is literally

16   cracked in the middle, so you would have to dispose of all

17   that.  You know, so that's going to be an added cost for

18   someone who buys the property because you can't build on that

19   pad, it's -- it's -- the foundation is bad.

20       But -- and then I know there was a lot of discussion on

21   the back parcel.  That's a spring that runs right down

22   through the middle of that valley.  And the State does not

23   deem anything to change the water flow -- it's really not --

24   there's -- there's very little space back there that you

25   could build on, so it is a dead space and, you know, is

1    anecdotal.  But it was described to us as -- as the -- the

2    testimony of the previous gentleman was it was -- when they

3    parceled that land, it was supposed to go to somebody else,

4    and then they decided not to buy it, and then it got tacked

5    on to us.  That is what actually happened, described to us by

6    a neighbor who actually was a part of the people that built

7    the first houses there.

8    Q    How long ago --

9    A    So --

10   Q    -- did you purchase that property?

11   A    We're getting about ten years, nine --

12   Q    And how --

13   A    -- nine, ten years.

14   Q    What was your purchase price?

15   A    I want to say it was around four sixty --

16   Q    Okay.

17   A    -- four seventy, something like that.

18   Q    All right.  Now do you have any children?

19   A    We have two, male, female.

20   Q    And --

21   A    The son lives with us.  He's in -- he's finishing

22   college, he's in his last semester of nursing school.

23   Q    And your daughter?

24   A    And our daughter is also a nurse here at Reading, and

25   she's currently deployed.

1    Q    Where is she deployed to?

2    A    Djibouti.

3    Q    I'm embarrassed to ask where that is, I actually don't

4    know.

5    A    Horn of Africa.

6    Q    The Horn of Africa.

7    A    Right.

8    Q    That much I do remember from geography.

9         Okay.  Now where does she come home to?

10   A    She comes home to us, yeah.

11   Q    So her residence -- is that her residence?

12   A    It is her listed home of record, yes.

13   Q    Okay.  So there's nowhere else for her to go --

14   A    Not yet.

15   Q    -- when she gets back.

16   A    No.

17              MR. TIDD:  Okay.  Nothing further, Your Honor.

18              THE COURT:  Okay.  Mr. Seitzer.

19                         CROSS-EXAMINATION

20   BY MR. SEITZER:

21   Q    Mr. Swartz, as an initial matter, I'm sorry to hear

22   about you and your wife's health.  Additionally, I want to

23   thank you for your service to our country.

24   A    Thanks.

25   Q    So I will be brief here.

1     You heard your wife testify that, currently, on a

2     monthly basis, it's hard to save because of non-routine

3     things.  Would you agree with that?

4     A     Yes.  And -- non-routine and, you know, normal upkeep of

5     -- of a house.

6     Q     So you would agree with your wife's testimony that,

7     every month, there may be only a couple hundred bucks left.

8     Is that correct?

9     A     That is correct.

10          MR. SEITZER:  All right.  And I'm going to go

11    beyond direct here -- I don't know if Mr. Tidd has any

12    objection -- just to make it easier for the Court and

13    everyone.

14          MR. TIDD:  Haven't heard it yet.

15    BY MR. SEITZER:

16    Q     A very simple question.

17    A     Yes, sir.

18    Q     There are two mortgages on this real property.  Is that

19    correct?

20    A     I would have to refer you to the -- to the wife.

21          MR. TIDD:  I can stipulate that there are.

22    Q     So that -- and yeah, it -- if Mr. Tidd is willing to

23    stipulate --

24          MR. TIDD:  Part of the schedules.

25    Q     There are two mortgages with a balance today of about

1    five twenty?

2             MR. TIDD:  Five twenty, two hundred and twenty-four

3    thousand.

4             MR. SEITZER:  That's fine, Your Honor.

5             MR. TIDD:  As per the last Schedule D.

6             MR. SEITZER:  Yes.

7             THE COURT:  Right.

8             MR. SEITZER:  And I have nothing further, Your

9    Honor.  Thank you.

10             THE COURT:  Okay.  Anything further?

11             MR. TIDD:  No.

12             THE COURT:  Okay.  You may step down.  Thank you.

13             THE WITNESS:  Thank you, Your Honor.

14         (Witness excused)

15             MR. TIDD:  Your Honor, if I may, I'm putting up --

16    you heard me reference -- I believe you heard me reference

17    communication with the U.S. Trustee's Office.

18             THE COURT:  Uh-huh.

19             MR. TIDD:  And I have that email chain here that is

20    -- let me get the exact number.  I apologize.  That Deininger

21    email chain is Exhibit 6, M-6.  I'd like to leave that up, in

22    case counsel has any desire to -- I'll start at the

23    beginning, where, as I stated, the U.S. Trustee wanted to

24    know why that excess was included on J.

25             MR. SEITZER:  I mean, Your Honor, that's obviously

1    hearsay and there's no foundation for that.  I -- if you --

2            MR. TIDD:  Well, it's my communication, as well.

3            MR. SEITZER:  Well --

4            MR. TIDD:  So I can put my communication response

5    in.

6            MR. SEITZER:  Well, I don't know about that.  But

7    with the U.S. Trustee's Office, you know, responding, I mean

8    --

9            THE COURT:  There's no doubt that it's a third --

10   you know --

11           MR. TIDD:  No doubt that it's --

12           THE COURT:  -- a third party --

13           MR. TIDD:  -- a third party.  But I'm not offering

14   it for the proof of the -- the truth of the matter asserted.

15           MR. SEITZER:  Then what are you --

16           THE COURT:  But aren't you?

17           MR. SEITZER:  -- offering it for?

18           MR. TIDD:  Well, no, because it's for the basis of

19   my amending Schedule I and putting in specific reference to

20   the HAVEN Act and why I -- and why I basically shifted

21   numbers to put the zero on J, versus somewhere else.

22           THE COURT:  I mean, I don't know that that requires

23   admission of the email.

24           MR. TIDD:  Okay.  I --

25           MR. TIDD:  I'm perfectly --

1           THE COURT:  Yeah.

2           MR. TIDD:  -- fine with you accepting my testimony.

3           THE COURT:  Well --

4           MR. SEITZER:  And it doesn't matter, Your Honor,

5      but --

6           THE COURT:  I will give it the appropriate weight,

7      let's put it that way.

8           MR. SEITZER:  That's correct, Your Honor.

9           THE COURT:  But I don't think I need --

10          MR. SEITZER:  Yes.

11          THE COURT:  -- the email.

12          MR. TIDD:  Okay.

13          MR. SEITZER:  Yes.

14          THE COURT:  And if Mr. Tidd is moving in his

15     documents now, I mean, I can tell you --

16          MR. TIDD:  No --

17          MR. SEITZER:  -- I have no objection -- you're not?

18          MR. TIDD:  Well, I was going to wait until --

19          THE COURT:  I think he was presenting additional

20     evidence, I think.

21          MR. SEITZER:  Oh, I don't --

22          MR. TIDD:  A little more.

23          MR. SEITZER:  I thought he was getting into the

24     documents.

25          THE COURT:  Okay.

1           MR. TIDD:  I usually wait to ask Your Honor if

2     there's any questions on the evidence before I move for --

3           THE COURT:  Well, I --

4           MR. TIDD:  -- anything to go in.

5           THE COURT:  Is there anything further that you want

6     to present --

7           MR. TIDD:  Well --

8           THE COURT:  -- versus --

9           MR. TIDD:  -- now this will be a party admission.

10    I do have an email chain from the -- with the trustee and

11    myself.  And she is the party to this action --

12          THE COURT:  And it's necessary --

13          MR. TIDD:  -- in the objection --

14          THE COURT:  -- because?

15          MR. TIDD:  One of the allegations -- actually, more

16    than one of the allegations in the objection that it was --

17    our timing of converting evidence is bad faith.  This email

18    chain shows that, when I learned there was a no asset case

19    notice being filed -- or asset case notice being filed, I

20    immediately contacted the trustee by email, politely, what is

21    the basis for the notice of asset case; I am investigating

22    potential equity in the estate, in real estate.

23          And then I responded:

24          "I'm not sure I understand why a notice before the

25          results of the investigation, I don't mean to be

1              obtuse, but I need to tell my clients a little more

2              than that.  Mr. Swartz has terminal counsel from

3              his experience in the military; hence, the VA

4              disability, and I don't want to cause him any

5              distress if I can help it."

6              MR. SEITZER:  I mean, Your Honor --

7              MR. TIDD:  Then --

8              MR. SEITZER:  -- I have a problem with this.

9              MR. TIDD:  No, no.

10             MR. SEITZER:  I mean, this is --

11             MR. TIDD:  Can I finish?

12             MR. SEITZER:  This email exists.  When it comes to

13     timing --

14             MR. TIDD:  No --

15             MR. SEITZER:  -- he does testify that he filed a

16     motion --

17             MR. TIDD:  Judge --

18             MR. SEITZER:  -- to convert after it was changed to

19     an asset case.  But Mr. Tidd can't give evidence.  That's

20     what he's trying to do --

21             THE COURT:  Agreed.

22             MR. SEITZER:  -- with these two issues.

23             THE COURT:  Agreed.  The timing --

24             MR. TIDD:  Well, just --

25             THE COURT:  -- is what it is.  I'm not sure --

1          MR. TIDD:  Just --

2          THE COURT:  -- that admitting --

3          MR. SEITZER:  Yeah, I mean --

4          THE COURT:  -- an email chain between you and the

5    trustee is appropriate.  I think the largest issues in this

6    case, in terms of bad faith are partially timing, but also

7    really more triggered by valuation and income and whether or

8    not there's the ability to be in a Chapter 13.  So, having

9    said that, I'm not sure that --

10         MR. TIDD:  Well, if --

11         THE COURT:  -- it's going to make a difference.

12         MR. TIDD:  If timing is not an issue -- I took it

13   as equal.

14         THE COURT:  I mean, I think --

15         MR. TIDD:  It's not a weighted --

16         THE COURT:  I think the docket certainly shows --

17         MR. SEITZER:  But yes, the docket, then --

18         THE COURT:  -- that there's a notice --

19         MR. SEITZER:  Then it was changed to --

20         THE COURT:  -- and then there's --

21         MR. SEITZER:  -- an asset case.

22         THE COURT:  Right.

23         MR. TIDD:  Right.

24         THE COURT:  Right.

25         MR. TIDD:  However, part of that argument, also, on

1    the part of the trustee, is that well, I didn't even file it

2    until after counsel was requested to be appointed in the

3    case.

4            MR. SEITZER:  Well, the docket says that.  I mean -

5    -

6            MR. TIDD:  Right.  And that helps you.

7            MR. SEITZER:  I --

8            MR. TIDD:  But I have --

9            MR. SEITZER:  I --

10           MR. TIDD:  -- a reason for that.

11           MR. SEITZER:  I will stipulate --

12           MR. TIDD:  I --

13           MR. SEITZER:  -- you had this email --

14           MR. TIDD:  But I need to finish.

15           MR. SEITZER:  -- before I got employed.

16           MR. TIDD:  I need to finish.  Okay.  You stipulate

17   that I got it before.  And like I said the reason was I got

18   no response, I filed it as soon as I saw that that -- that

19   was the response I got was the application to be -- to

20   employ; hence, that's when I filed.  I was trying to have a

21   dialogue with the trustee about what was going on, what we

22   could do.  All I got was an application to employ, so that's

23   why I did it then.

24           THE COURT:  Okay.  Having said all of that, again,

25   I'm not going to admit the email chain.

```
 1              MR. TIDD:  Understood.

 2              THE COURT:  To the extent that I need to take

 3     notice of what happened on the docket, it's fine.

 4              But with respect to your case-in-chief, is that it

 5     or is there more?

 6              MR. TIDD:  Well, argument with respect to a few --

 7              THE COURT:  Right.

 8              MR. TIDD:  -- a few of the points that we can't do

 9     from testimony, comparing the relative --

10              THE COURT:  In terms of a closing.

11              MR. TIDD:  Yes.

12              THE COURT:  Okay.

13              MR. TIDD:  And addressing all four points or so of

14     --

15              THE COURT:  Understood.

16              MR. TIDD:  Yeah.

17              THE COURT:  What I'd like to do, since it's now one

18     o'clock --

19              MR. TIDD:  Okay.

20              THE COURT:  -- I think everyone needs a little bit

21     of a break, at least I do, and I understand, Mr. Seitzer,

22     that you still have whatever evidence you would like to

23     present.

24              MR. SEITZER:  Yes, Your Honor.  I mean, Your Honor

25     can do whatever Your Honor wants.
```

```
 1              THE COURT:  I mean, I'm going to take a short

 2      break.

 3              MR. TIDD:  You're not asking --

 4              MR. SEITZER:  And I'm not --

 5              MR. TIDD:  -- right.

 6              MR. SEITZER:  -- telling you --

 7              THE COURT:  What I'm --

 8              MR. TIDD:  You're telling, just --

 9              THE COURT:  -- trying to -- what I'm trying to

10      convey is I don't like to stop in the middle of someone's

11      case, so I want to make sure that you are finished with

12      respect to presenting your evidence before I take that break.

13              MR. TIDD:  Yes, correct.

14              THE COURT:  Okay.  So we will take a break for

15      about a half an hour, and then we'll back roughly at 1:35;

16      and, at that point, presumably, Mr. Seitzer, you'll present

17      whatever it is --

18              MR. SEITZER:  Yes, Your Honor.

19              THE COURT:  -- that you're going to present and

20      then we'll close after that.  But I just want to do it in a

21      way that's fair to everybody because I don't like to do it in

22      the middle, so that's what we're going to do.  And I will see

23      you back here in about 30.

24              MR. SEITZER:  Thank you, Your Honor.

25              THE COURT:  All right.  Thank you.
```

1          (Recess taken at 1:03 p.m.)

2          (Proceedings resume at 1:37 p.m.)

3          (Call to order of the Court)

4              THE CLERK:  You may be seated.

5              THE COURT:  All right.  We're back, presumably on

6      the record, Keith?

7              THE ECRO:  Yes.

8              THE COURT:  We're good?

9              THE ECRO:  Yeah, we're good.

10             THE COURT:  All right.  Mr. Seitzer, it is your

11     turn.

12             MR. SEITZER:  Thank you, Your Honor.  I'm going to

13     call Mr. David Decembrino.

14         (Witness summoned)

15             THE ECRO:  Please raise your right hand.

16      DAVID PETER DECEMBRINO, WITNESS FOR THE CHAPTER 7 TRUSTEE,

17                             SWORN

18             THE ECRO:  State your name and spell your whole

19     name for the record.

20             THE WITNESS:  David Peter Decembrino, D-a-v-i-d, P-

21     e-t-e-r, D-e-c-e-m-b-r-i-n-o.

22             THE COURT:  You can have a seat.

23             THE WITNESS:  Thank you, Judge.

24                      DIRECT EXAMINATION

25     BY MR. SEITZER:

```
 1    Q    Sir, what do you do for a living?

 2    A    I'm a professional real estate agent.

 3    Q    And who do you work for?

 4    A    Re/Max of Reading.

 5    Q    And how long have you been a real estate agent?

 6    A    Twenty-six years.

 7    Q    Do you specialize in any county or --

 8    A    I -- primarily here, in Berks County, yes.

 9    Q    Okay.  And have you been involved in a bankruptcy case

10    similar to this?

11    A    Yes.

12    Q    And where there was a valuation issue dealing with an

13    appraiser and appraisal?

14    A    Yes.

15    Q    And can you please testify as to what transpired in that

16    case?

17    A    Yeah.  In -- in the case that you're referring to, I was

18    --

19              MR. TIDD:  Objection.

20    A    -- contacted by --

21    Q    They have an --

22              THE COURT:  Hold on.

23    Q    One second.  They have an objection.

24              MR. TIDD:  I'm not sure this goes to either

25    qualification or is, in any way, relevant to what we're doing
```

1    here.

2              MR. SEITZER:  Just going to testify as to how he's

3    been in a similar situation, where, essentially, a CMA versus

4    an appraisal and what happened, meaning the differences

5    between what an appraiser might say and what happens in

6    actuality.

7              MR. TIDD:  Phrasing it that way is very different

8    than being case specific.

9              THE COURT:  Well, presumably, you want to have him

10   --

11             MR. SEITZER:  Essentially, testify that --

12             THE COURT:  -- testify as --

13             MR. SEITZER:  -- appraisals aren't correct.

14             THE COURT:  -- an expert, right?  And to give --

15             MR. SEITZER:  Uh-huh.

16             THE COURT:  -- his opinion.  So I think -- why

17   don't we qualify him first?

18             MR. SEITZER:  Well, I'm not qualifying him as an

19   expert --

20             THE COURT:  You're not.

21             MR. SEITZER:  -- Your Honor.

22             THE COURT:  Oh, you're not.

23             MR. SEITZER:  I'm not, I'm not.

24             THE COURT:  Okay.  All right.  So I suppose my

25   issue is what happens in one case isn't necessarily the same

1    in another case.

2                MR. SEITZER:  He --

3                THE COURT:  So maybe there's another way to do it

4    without him --

5                MR. SEITZER:  Okay.

6                THE COURT:  -- testifying about what he did in a

7    prior case.

8    BY MR. SEITZER:

9    Q    Sir, have you sold -- have you been a broker for real

10   property before at a number much higher than what an

11   appraisal said?

12   A    Yes, sir.

13   Q    What were the facts in that case?

14   A    The appraiser gave a value to the debtor's attorney for

15   290,000.  I was contacted by the trustee.  She believed that,

16   I guess, through her analysis, that the property value was

17   considerably higher.  She asked me to do a market analysis,

18   which I did.  The property value came in at 425,000.  We

19   listed the property and it was gone in 3 days for four

20   hundred and twenty cash.

21   Q    So your testimony is appraisals aren't always correct in

22   the real world.

23                MR. TIDD:  Objection.  Leading.

24                THE COURT:  I'm going to allow it.

25                You can answer the question.

```
 1                  THE WITNESS:  I would say correct, not always.

 2     BY MR. SEITZER:

 3     Q    Did you have a chance to read the appraisal prepared by

 4     the debtors' counsel --

 5     A    I --

 6     Q    -- Mr. Ryan Achenbach?

 7     A    I did.

 8     Q    And can you -- wait, let's cut this off first.  You --

 9                  MR. SEITZER:  Strike that, Your Honor.  I'm sorry.

10     Q    You physically inspected this real property at issue,

11     correct?

12     A    I did.

13     Q    And you checked the inside and the outside.

14     A    Yes.

15     Q    Is that correct?

16          And can you please explain to the Court, briefly, your

17     thoughts on this property?

18     A    My thoughts on the property is that it's located in an

19     area that is extremely desirable with regards to homes that

20     have large acreages.

21          I -- I thought that the appraisal was interesting, that

22     the acreages that were noted in the -- in the appraisal were

23     all under ten acres.

24     Q    Well, let's not talk about the appraisal yet.

25     A    Okay.
```

1    Q    Just tell the Court what your thoughts are on the house

2    and some of the specific --

3    A    Yeah, I mean, my --

4    Q    -- features.

5    A    -- my initial thoughts on the house was a house that was

6    in very nice condition.  It had a fully finished lower level,

7    daylight basement, far more square footage than is stated in

8    the -- in the MLS system and in -- in the tax records and, as

9    of today, realized that there was additional acreage that

10    even I was unaware of.  So, I mean, I was going under the

11    premise that there was 18 acres, not knowing that there was

12    what, 27?

13    Q    And can you please describe to the Court the basement

14    here, so that she can get an idea as to what we're talking

15    about?

16    A    Yeah.  I mean, my -- my recollection is, you know, it's

17    a -- it's a -- it appears to be like a Cape Cod style home,

18    with a full basement.  And my recollection was every bit of

19    the basement is finished.  It looked like an in-law quarters

20    or an area where the -- the debtors' son was actively living.

21    Q    And what's the grade on that?  You walk out onto --

22    A    Yeah, you --

23    Q    -- a yard or is it underground?

24    A    You can walk right out the back of that lower level

25    family room, or whatever you want to call it, onto -- onto

1    grade.

2    Q    Okay.  So let's talk about the appraisal now prepared by

3    Mr. Achenbach.  Did you have a chance to review it?

4    A    Yes.

5    Q    And please explain your thoughts on the appraisal?

6    A    Yeah.  I mean, the -- the initial thing -- thing that

7    struck me was that, in that area, if I'm doing a market

8    analysis for fair market value of a property, I want to look

9    for like homes on like-sized properties.  There were only

10   three comps, none of them had more than ten acres.

11       I mean, when you are dealing with a ten-acre property,

12   or you're dealing with a property that's likely in clean and

13   green, which lowers your tax exposure, so it -- it makes

14   those larger-acreaged properties very desirable and valuable.

15   Q    Did you prepare a comparative market analysis for this

16   property?

17   A    I did, I did two.

18            MR. SEITZER:  Your Honor, if we could pull it up?

19   It's Exhibit T-4.  I have it on my system, I don't know if

20   I'm plugged in correctly.  There it is.

21            THE WITNESS:  Uh-huh.

22   BY MR. SEITZER:

23   Q    So, sir, is this the CMA you prepared for the property

24   at issue?

25   A    Yeah.  Yeah, that's probably the first one that was

 1    prepared on 2 -- 2/5 or 2/7.

 2    Q    This is the one that you provided me yesterday, I

 3    believe.

 4    A    Okay.  So that was an updated version.

 5    Q    Yes.

 6         So you can please go through it, starting at Page 4?  Do

 7    you have it in front of you, sir?

 8    A    I do.

 9    Q    So Page 4, you have two columns here.  Can you please

10    explain these?

11    A    Yeah.  One is an 1800s farmhouse that is on -- if you

12    could page down a little bit.

13    Q    Uh-huh.

14    A    Ten acres.  So that would be probably a property that is

15    in clean and green, and it's sold for $1,150,000.

16    Q    Out of your CMA, which property do you think compares

17    most similarly to the property at issue?

18    A    Well, for certain, it would be the one on Texter

19    Mountain Road, where the subject -- debtors' subject property

20    is.

21    Q    And that's at 1380 Texter Mountain Road?

22    A    That is correct.

23    Q    And that's on Page 5 of Exhibit T-4?

24    A    That is correct.

25    Q    Can you please describe to the Court this property?

1    A    Yeah, this would be a stick-built, kit-style home.  It's

2    a three-bedroom, one and a half baths.  It states -- I don't

3    know what the stated square footage of that property was.

4    I'm sorry.  Can you go back up a little bit?  Oh, here it is.

5    It says 2,930 square feet; daylight, full, improved basement

6    on 12.8 acres.  And it looks like it sold for $790,000.  It

7    was listed at seven ninety-eight and days on the market was

8    10.

9    Q    Do you think that the 27 acres at issue between these

10   two parcels really makes a difference when it comes to the

11   price of this property?

12   A    I think it absolutely improves the value of the

13   property?

14   Q    Why?

15   A    Well, I mean, if you know that area of Berks County,

16   which is also very close to the Lancaster line -- I know

17   property owners there.  I know people that are engaged in a -

18   - in a -- in a process out there called "QDM," which is the

19   quality deer management.  And they all agreed to grow -- grow

20   big deer and hunt those big deer, and that's -- that's in the

21   area.  So it's a -- it's a desirable property from a -- from

22   a hunting perspective or having a property that you can

23   recreate on.

24   Q    So, if it -- if you were to be retained by the seller of

25   the property at 815 Texter Mountain Road, what would you

1   think you would list this property at?

2   A    I mean, on both of my market analyses, the -- the median

3   average was in the sevens to eights.  So I said to the -- to

4   the trustee, I put it at seven fifty as a -- as a -- as a

5   fair number.

6   Q    I mean, and you think it could conceivably get more than

7   that?

8   A    It could -- could get bid up.

9   Q    And can you go into a little more detail as to why you

10  think seven fifty is a potential sale price for this house?

11  A    Well, like I said, I mean, you're -- you're talking

12  about 27 acres, private driveway, kind of like your own

13  little haven back in the woods, with a pool, a couple

14  different outbuildings.  And you know, you're not looking at

15  any neighbors.

16  Q    And these columns in your CMA do reflect that that could

17  be a fair market value.

18  A    Well, yeah.  And again, the -- the difference between

19  what I do and what the appraiser does is, I mean, my -- my --

20  my process is to find fair market value for resale, today,

21  what do I think the house will sell for today.  And my system

22  and the MLS system gives me the ability to plug in all these

23  comps, whether they're smaller acreages, bigger houses.  And

24  they will compare to a subject property and it will render a

25  decision on value, median average, low to high.  So my -- my

1   mind always goes to median average.

2   Q    Thank you.

3        MR. SEITZER:  I have no further questions on

4   direct, Your Honor.

5        THE COURT:  Okay.  Mr. Tidd.

6                     CROSS-EXAMINATION

7   BY MR. TIDD:

8   Q    You described this property, sir, as a Cape Cod.  It's

9   not a Cape Cod, it's a saltbox home, correct?

10  A    I -- it's hard to say what it is.  I -- it would be -- I

11  hate to say -- I hate to call it a "contemporary home," but

12  it -- it does not have a traditional -- traditional feel on

13  the inside.

14  Q    Well, I was going to ask you to refer to the photographs

15  of the property in the CMA, but there are none.

16       You didn't take any pictures of the property inside --

17  A    I didn't --

18  Q    -- or out, did you?

19  A    -- take any pictures.

20  Q    And you didn't walk the whole property, did you?

21  A    I didn't walk the whole property.  I -- I toured the

22  inside of the property and a little bit of the outside.

23  Q    Did you bring so much as a notebook in with you, when

24  you went into the house?

25  A    I brought my phone.

1    Q    And you didn't take any pictures?

2    A    No.

3    Q    Okay.  Regarding your comps, 1280 South Cocalico Road.

4    That's an auction result, correct?

5    A    1280 South Cocalico.

6              MR. SEITZER:  What page is this on the screen?

7              MR. TIDD:  It's right in front of you --

8              THE WITNESS:  Yep.

9              MR. TIDD:  -- 1280 South Cocalico --

10             MR. SEITZER:  Okay.

11             MR. TIDD:  -- the middle one.

12             THE WITNESS:  Yeah.  I'm not -- I'm not aware of

13    whether that was an auction or not.

14    BY MR. TIDD:

15    Q    Okay.  It is, and we can bring somebody up to show that.

16         3 Glassmoyer Lane.  Are you aware that's an auction

17    result, also?

18    A    No, I was not.

19    Q    85 Vera Cruz Road.  Are you aware that that's an auction

20    result, also?

21    A    I was not.

22    Q    And when properties are appraised, we don't usually --

23    you don't usually -- would include an auction value, due to

24    the difference in marketing, arm's length transaction,

25    correct?

1   A    I don't understand that thought process.  I mean, a sold

2   --

3   Q    Do you --

4   A    -- a sold comp is a sold comp.

5   Q    Are they sold in different ways at auction, versus

6   someone who markets their home to the general public?

7   A    Yeah.  I mean, it -- you can -- you can -- well, the

8   average person can go to an auction and the average person

9   can tour a house for sale, and market value is determined by

10  what -- what they make their offer at.

11  Q    You know that appraisers can't include auction values.

12  A    Didn't know that.

13  Q    113 Stella Drive you have as a comp.  Are you aware that

14  that's a registered historical estate?

15  A    No.

16  Q    Are you aware that 1040 Brownsville Road is a working

17  farmette?

18  A    No.

19  Q    Are you aware that 230 Wernersville Road is a large

20  estate -- although the acreage I missed, I apologize -- with

21  manicured gardens, et cetera?

22  A    No, sir.

23  Q    Okay.  Did you prepare -- or you didn't prepare, I

24  should say, a market analysis as of the filing date of the

25  debtors' petition, November 22nd, 2024.

1    A    No.

2    Q    Your values are all February on, correct?

3    A    That's correct.

4    Q    Okay.  You didn't attempt to do one as of the file -- as

5    of what was told --

6    A    I don't believe --

7              MR. SEITZER:  Objection --

8    A    -- I was called until --

9              MR. SEITZER:  -- Your Honor.

10   A    -- early February.

11             MR. SEITZER:  Relevance.  It doesn't matter what

12   the property was worth then; it matters what it's worth now.

13             MR. TIDD:  I beg to different, especially in a good

14   faith argument, where, if you're going to combat my value as

15   of my filing date, there should be at least --

16             THE COURT:  I'm going to allow the --

17             MR. TIDD:  Oh, I understand.

18             THE COURT:  -- the question, so --

19             MR. TIDD:  I understand, yeah.

20             THE COURT:  -- I'm going to overrule the objection.

21             MR. TIDD:  Yeah, okay.  Thank you.

22             THE COURT:  And you can --

23             MR. TIDD:  I'm sorry.

24             THE COURT:  -- argue --

25             MR. TIDD:  I thought you were --

1          THE COURT:  -- later.

2          MR. TIDD:  -- looking to me for a response.

3          THE COURT:  No.

4          MR. TIDD:  I apologize.

5          THE WITNESS:  Your question?

6     BY MR. TIDD:

7     Q    I believe it was you didn't prepare anything with an as

8     of date --

9     A    No.  The trust --

10    Q    -- as of November --

11    A    The trustee --

12    Q    -- 21st --

13    A    -- didn't contact me until early -- early February 2025.

14    Q    Okay.  Thank you.

15         And let's see.  What else, what else, what else?

16         And in fact, your original -- well, actually, the

17    appraisals that you performed, you only listed 18 acres,

18    when, in fact, it was considerably larger than that.

19    A    Yeah, that's correct.

20    Q    Okay.

21    A    The only two parcels that actually show up in Berks

22    County tax records are a 5 and a 13.

23    Q    So you don't have access to the same information that an

24    appraiser does.

25    A    Evidently not.  I didn't have access to Lancaster maybe.

1    Q    Okay.  Did you even see -- you didn't even see that it

2    was partially in Lancaster then?

3    A    No.  I mean, the only thing that shows up in Berks

4    County tax records are a rural land parcel and a parcel with

5    the home.  The home is shown on 5 and 13 would be the

6    balance.

7    Q    So it's safe to say you didn't pull a copy of the deed.

8    A    I did not.

9    Q    Okay.  Any tax records pulled?

10   A    I probably have that back in my office, yeah.

11   Q    But only for --

12   A    The two that were present in --

13   Q    Berks County.

14   A    Correct.

15   Q    Okay.  So you don't have a complete picture in your

16   appraisal of the meet -- not exactly --

17   A    Well --

18   Q    -- the meets and bounds -- I'm not done with my

19   question, hold on, respectfully.  I apologize.

20        You don't, in fact, have a full description, with

21   respect to acreage, boundaries, counties, and townships that

22   are the situs of this property, correct?  They're not there.

23   A    There -- there would -- you're correct.  There would be

24   a missing --

25   Q    They're not --

1    A    -- parcel that I was only aware of today.

2    Q    So it's not complete, that's with respect to acreage or

3    the -- where this is situated, as far as counties go.

4    A    Well, I know where it's situated as far as counties go.

5    Q    Well, you do now.

6         But in the appraisal, in the CMA, that is not listed --

7    A    I -- I can only work --

8    Q    -- right?

9    A    I can only work with what I have.

10   Q    And you didn't have everything to do this property.

11   Okay?

12              MR. TIDD:  I have nothing further.

13              THE COURT:  Mr. Seitzer, any --

14              MR. SEITZER:  I've got one brief question.

15                          REDIRECT EXAMINATION

16   BY MR. SEITZER:

17   Q    Sir, you're testifying that you based the seven-hundred-

18   and-fifty-thousand-dollar listing price on 13 acres.  Would

19   it be higher now at 24 acres?

20   A    It could be.

21              MR. SEITZER:  Nothing further, Your Honor.

22              THE COURT:  Okay.  You can step down.  Thank you.

23              THE WITNESS:  Thank you.

24         (Witness excused)

25              THE COURT:  Mr. Seitzer, do you have anything else

1    that you wanted --

2                    MR. SEITZER:  No --

3                    THE COURT:  -- to present?

4                    MR. SEITZER:  -- Your Honor.

5                    THE COURT:  No.  Okay.

6                    MR. TIDD:  Mr. Achenbach on rebuttal, if I may?

7                    THE COURT:  Sure.

8                    MR. TIDD:  Mr. Achenbach?

9        RYAN ACHENBACH, WITNESS FOR THE DEBTORS, PREVIOUSLY SWORN,

10                          RESUMES STAND

11                    MR. TIDD:  Thank you, Your Honor.  I'll be brief, I

12   promise.

13                    THE COURT:  Okay.

14                          DIRECT EXAMINATION

15   BY MR. TIDD:

16   Q    Mr. Achenbach, remember, you're still under oath --

17   A    Yes.

18   Q    -- from the previous swearing-in.

19        You've heard the previous testimony.  You heard my

20   comment about using auction results.

21   A    Uh-huh.

22   Q    Do you use auction results?

23   A    I do not, unless it's a last resort as -- and not as a

24   primary comparable.  The only -- the only time I would be

25   able to -- to use them would be as supportive data.

1    Q    Were they primary comparables in the CMA that we --

2    A    In the CMA, it appears to me.  I don't do them, so just

3    --

4    Q    But the one that you witnessed.

5    A    Based on what I'm looking at, it appears as though

6    they're all considered primary because they're all put into

7    the -- the averages, in order to find the -- the mean,

8    median, you know, the -- the average value.

9    Q    And why the aversion for auction -- to auction results?

10   A    Two primary reasons:

11   They're a different type of sale, so there's something

12   that's known -- out there known as "auction fever."  Harvard

13   actually has a study done on this, where they -- they call it

14   "competitive arousal."  And it's the phenomenon that, even,

15   if, for example, gift cards go for sale on eBay, they found

16   that almost half the people that bid on them paid more than

17   if they just went to a store and bought them because there's

18   something in regards to the -- the process of having bidders

19   with competitors right there with you that allows for things

20   to get inflated very quickly.

21   The second reason why I wouldn't use an auction would be

22   because of the fact that you have kind of different buyers,

23   as far as I'm concerned.  You know, when you're looking at

24   down payment money for a home, you know, a lot of people,

25   depending on the financing they do now, can do as little as

1    zero, 3 percent, 5 percent.  I mean, you're looking at

2    auctions where you, typically, have to have 10 to 20 percent

3    down on the day of the auction in good faith, and then you

4    can try to, you know, get your financing after the fact.  If

5    we're talking about million-dollar properties, you're talking

6    about very affluent buyers that don't necessarily mind if a

7    price gets pushed up because they're already cash affluent.

8    If they want a property they're going to go after it, and ten

9    you have those other factors involved.

10   Q    Now that methodology and the basis thereof, is that your

11   -- do your peers file the same --

12   A    I --

13   Q    Is that standard in your industry?

14   A    I would not, on a lending appraisal, be allowed to use

15   an auction, unless I gave very good reason.  I would have to

16   spend a fair amount of time explaining why I decided to use

17   it.

18   Q    So it wouldn't be accepted.

19   A    I don't think it would be accepted as a primary

20   comparable unless I had nothing else.

21        There are occasions where I've had literally nothing,

22   and then I've had to spend a tremendous amount of time

23   explaining how I tried to build this into and how it has an

24   effect on value.

25   Q    Now you may have heard me reference 113 Stella Drive,

1    which is actually -- is it -- was it a registered historic --

2    A    It's -- it's known in the area.  I don't know about the

3    registry part, but it's known -- it's from the 1800s.

4    Q    Okay.

5    A    It's a four-thousand-square-foot stone farmhouse, which

6    is going to have, most likely, like two-foot stone walls.

7    That's the way they were made back on these estates.  It's

8    known as the Historic Blue Pig Farm, which I know doesn't --

9    might not sound -- but we're talking about a rural area.  So

10   it's noted in the area, people know about it.

11        If you go into the real estate listing for it, I mean,

12   the listing kind of describes it itself:

13                 "Discover the enchanting beauty of Blue Pig Farm, a

14                 magnificent Pennsylvania farmhouse set on a

15                 picturesque 10 acres of pristine land, enriched

16                 with natural charm and a large tranquil pond."

17       And that doesn't even get into the house, which has been

18   completely remodeled.

19       So you're talking about a magnificent, I'd call it a

20   "mansion."  It's over 4,000 square feet.  It's 10 picturesque

21   acres.  I wouldn't call the acreage of the subject property

22   to be "picturesque."  It's rugged and wooden and -- and high

23   -- and you know, you've got work to do there, you know,

24   cleaning debris and things like that.  It's not a -- it's not

25   an estate.

1    Q    Is there an aesthetic charm issue between a thirty-six-

2    year-old stick frame saltbox and a historic farmhouse?

3    A    Oh, absolutely, especially when it's known in the area

4    for having a -- you know, a history of -- of use and -- and

5    charm to it.  It -- it's been kept up and -- and you know,

6    clearly, the -- you know, whatever owners decided to do and

7    decided to take this and completely remodel it, which is not

8    easy to do, especially, like I said, when you've got these --

9    these deep -- it's -- it describes in here that it's

10   limestone walls in the house.  That's not easy to -- to

11   remodel and get into.  So you have a significant investment

12   in that house, beyond just building and maybe updating a

13   kitchen and bathroom.

14   Q    Now 1040 Brownsville Road is a farmette?

15   A    Yes.

16   Q    How would you describe that property?

17   A    It was an original farmhouse, which an owner is --

18        MR. SEITZER:  Your Honor, my only objection is that

19   the witness obviously has information that he's reading off

20   of.

21        THE COURT:  Do you have documents with you?

22        THE WITNESS:  Well, these are all the listings that

23   --

24        MR. SEITZER:  Yeah.

25        THE WITNESS:  -- he provided.  It's just the MLS

1    listing.

2              MR. SEITZER:  I mean --

3              MR. TIDD:  It's in the appraisal.

4              THE COURT:  So is it the CMA?

5              MR. SEITZER:  No.

6              THE COURT:  It's not.

7              MR. SEITZER:  It's his own personal information.

8              THE WITNESS:  It's not my personal information.

9    So, essentially, he went into the MLS and picked, I forget

10   how many properties, nine maybe.  And these are simply the

11   corresponding -- like this is what he pulled from, this is

12   printed off of the MLS, which he was looking at before he --

13   as he was using them.  This is MLS access.  This isn't my --

14   like I don't have special access to this.

15             MR. SEITZER:  Your Honor, but --

16             THE COURT:  Right.  But they're not attached to

17   your exhibit.

18             MR. SEITZER:  No, no.  It's the cheat sheet for the

19   witness, I guess.

20             THE WITNESS:  No, no.  Well, they shouldn't be.  I

21   mean, he mentioned that three of them aren't auctions.  They

22   say on the listings that he reviewed that --

23             MR. SEITZER:  No.  His testimony --

24             THE WITNESS:  -- they're auctions.

25             MR. SEITZER:  -- was he --

1          THE WITNESS:  And this is --

2          MR. SEITZER:  -- wasn't aware.

3          MR. TIDD:  This is rebuttal.

4          THE WITNESS:  This is the data that a realtor

5     should be reading.

6          MR. SEITZER:  He -- but you're a witness, you're

7     not allowed to have a cheat sheet.  That's my only point.

8          THE COURT:  Agreed.

9          MR. TIDD:  Okay.

10         THE COURT:  So --

11         MR. TIDD:  Now he -- well, as an expert, though, he

12    is permitted to have the results of his own research after --

13         THE COURT:  But that's not what he relied on for

14    his appraisal.

15         MR. TIDD:  No, not for his appraisal.

16         THE COURT:  Well, so --

17         MR. TIDD:  But if --

18         THE COURT:  -- he can have that and he can have his

19    sources for his report, but he can't have independent

20    information that's not in the report of the other side.

21         MR. TIDD:  He can have the results -- respectfully,

22    I submit he can have the results of his own research in

23    reviewing the veracity of the report being offered by the

24    trustee.

25         THE WITNESS:  Can I ask a question?

```
 1            MR. TIDD:  No, no.

 2        (Laughter)

 3        (Participants confer)

 4            MR. TIDD:  Even if they were both experts, they

 5    would have the right to review ahead of time.  This is just

 6    what's available right this second.

 7            THE COURT:  Well, the realtor wasn't qualified as

 8    an expert.

 9            MR. TIDD:  But -- which makes --

10            THE COURT:  And it's not --

11            MR. TIDD:  -- it even easier.

12            THE COURT:  -- his expert report.

13            MR. TIDD:  But it's being offered as that person's

14    opinion.

15            MR. SEITZER:  It's not being offered.  He's reading

16    something that he got from somewhere else.

17            MR. TIDD:  No, not what he's offering.  We have the

18    CMA being offered.

19            THE COURT:  That has a summary of this information.

20            MR. TIDD:  A summary, which is a summary of this

21    information.  It's selectively missing from this.  This is to

22    impeach this document, this exhibit.  In other words, this

23    information was pulled from that source, but only the bottom

24    line number shows up, for practical -- practically speaking.

25    This is impeaching this document.
```

```
 1                THE COURT:  Is there any reason to believe, Mr.

 2       Seitzer, that the documents --

 3                MR. SEITZER:  No.  No, Your Honor.

 4                THE COURT:  -- that he's relying on --

 5                MR. SEITZER:  It's just so --

 6                THE COURT:  -- are not --

 7                MR. SEITZER:  -- blatantly obviously --

 8                THE COURT:  -- the same thing?

 9                MR. SEITZER:  -- that he's reading from, you know,

10       something that wasn't his.

11                THE WITNESS:  But it's --

12                MR. SEITZER:  But agree, Your Honor, I --

13                THE COURT:  But it's the same --

14                MR. SEITZER:  Yes.

15                THE COURT:  -- information.

16                MR. SEITZER:  I mean, I'm not going to sit here and

17       say that he's lying, Your Honor, because I'm sure he's not.

18                THE COURT:  Okay.

19                MR. SEITZER:  But my point being a witness can't

20       have materials that --

21                THE COURT:  Agreed.  So --

22                MR. TIDD:  I can have it turn him over and do it

23       from memory.

24                THE COURT:  To the extent that you can take those

25       documents --
```

1          MR. TIDD:  Yes, I can.

2          THE COURT:  -- from your witness --

3          MR. TIDD:  Yes.

4          THE COURT:  -- and you can feel free to question

5     him --

6          MR. TIDD:  Absolutely.

7          THE COURT:  -- without them --

8          MR. TIDD:  Okay.

9          THE COURT:  -- that would be fine.

10    BY MR. TIDD:

11    Q    1040 Brownsville Road.

12    A    Yes.

13    Q    What do you recall?

14    A    On the MLS listing, you're allowed to look at all of the

15    photos.  And everything that I have there, this was an

16    original farmhouse that ended up having a very large, almost

17    like Italian-style addition put onto it.  It has clay tile

18    roof, shingles.  It -- the inside has been completely

19    updated, also with kind of a Mediterranean flare to it of --

20    of like stucco on the interior and exterior.  So it's -- it's

21    a farmhouse that has been completely revamped.

22         Now also on the property, which is very important to

23    note, it operates as a farmette.  It has a gigantic bank barn

24    on it, I'm guessing somewhere in the neighborhood of -- of --

25    you know, like a farm bank barn, maybe 40 by 80, somewhere

1    around there.  The entire bottom has garage bays underneath

2    it, and then there's a game room inside, so it's at least

3    partially finished.  So, once again, if you're -- if you're

4    taking this property, it is not, in my opinion, a comparable

5    to the subject property.

6    Q    Is the finished bank barn actually separate from the

7    dwelling?

8    A    Yes.

9    Q    So it's an additional space --

10   A    Yes.

11   Q    -- separate.

12   A    Yes.

13   Q    230 Wernersville Road, the garden estate.

14   A    Yes.

15   Q    How is that different?

16   A    Once again, you're talking about a very large -- I don't

17   know if you'd want to scroll, so I could have that in front

18   of me just for the square footage, but it's very large.  The

19   house is a large, two-story home with -- with big columns in

20   the front.  So, once again, you're talking about kind of an

21   estate, very stately feel to it.

22        This then, if you look at the other photos, has a number

23   of manicured gardens that you walk through a path, it has

24   pergolas that are out in these gardens.  So, once again,

25   you're -- you're talking about a higher-end kind of estate of

1    -- I don't know whether I'd call it "majesty," but you're

2    looking at mansion-type properties, where people that are

3    affluent want to have something you can -- you can bring

4    people there to showcase.  You know?

5        Out in the garden, there's outdoor fireplaces in at

6    least two of the three properties we're talking about here,

7    for gathering.  And that's just not what we have at the

8    subject property, it's not even remotely close to that.

9    Q    Would it ever be appropriate for you to -- after pulling

10   the MLS, to select the features you wanted in your appraisal

11   and to omit anything that took away -- would take away from

12   your number?

13   A    I think a CMA is very, very --

14   Q    Well, in an appraisal.

15   A    In an --

16   Q    Would you ever --

17   A    -- appraisal?

18   Q    Could -- would you ever do that in an appraisal, pick

19   and choose --

20   A    Not necessarily --

21   Q    -- features that helped?

22   A    I know it's come up, for example, that I used

23   comparables that were smaller in acreage.  But that doesn't

24   just exist in a vacuum.  If you take a look at the comments

25   and my appraisal report, I have to -- I have to declare it

```
1     and I have to make adjustments for the impact on value.  So

2     just because they're smaller doesn't mean they receive no

3     adjustment at all.

4          I actually went through the process of comparing the

5     three properties that I used to try to isolate what I felt,

6     in my opinion, the per acre value was, in order to form the

7     basis of the adjustment, which ended up being 9,000 per acre

8     in my particular report for the subject property.  So, even

9     though they were smaller, they -- they end up all getting

10    adjusted for.

11         So I can't necessarily pick and choose because, in the -

12    - in the world I'm in, it's going to get scrutinized by

13    somebody, and I have to be able to back it up with -- with

14    commentary, typically that's already in the report.  And I

15    find a CMA typically lacks that.  It -- I didn't see

16    commentary in it and I wouldn't expect it.

17    A     Like --

18    Q     And you --

19    A     -- he didn't do --

20    Q     -- didn't see --

21    A     -- anything different.

22    Q     -- any in this.

23    A     Not commentary.  But I -- I wouldn't expect it.  It's

24    mostly -- you know, it's not to call it Zillow, but it's very

25    similar.  A CMA -- and I'm not an expert on this, but you
```

1    know, you pick the properties you want and -- and the

2    software will actually produce and crate graphs and maps and

3    everything for you, as opposed to what I have to do is

4    compare the properties and establish my own fine-tuned

5    thinking of what impacts value, how, why, et cetera.

6              MR. TIDD:  Nothing further.

7              MR. SEITZER:  I have nothing, Your Honor.  Thank

8    you.

9              THE COURT:  You can step down.  Thank you.

10             THE WITNESS:  Thanks.

11         (Witness excused)

12             THE COURT:  Okay.  Let's talk about exhibits that

13   you want moved in before I have you -- unless there's

14   something else.  I'm sorry.

15             MR. TIDD:  No, nothing.

16             MR. SEITZER:  Nothing further, Your Honor.

17             MR. TIDD:  Not -- no.  I was going to say --

18             THE COURT:  I just wanted to talk about exhibits

19   before we sum up, so that I can --

20             MR. SEITZER:  I don't know if --

21             THE COURT:  -- make sure --

22             MR. SEITZER:  -- Mr. Tidd wants to go first.

23             THE COURT:  -- that we know which ones are coming

24   in.

25             MR. TIDD:  Well, if you --

1              MR. SEITZER:  I only have one, Exhibit T-4.

2              THE COURT:  Okay.

3              MR. TIDD:  No objection.

4              THE COURT:  All right.  So T-4 will be admitted.

5          *(Exhibit T-4 received in evidence)

6              THE COURT:  And then you have 1 through 3?

7              MR. TIDD:  I have 1 through 3 and Number 5.

8              MR. SEITZER:  Is 5 the --

9              MR. TIDD:  Income.

10             THE COURT:  What's 5?

11             MR. SEITZER:  I'm fine with that.

12             MR. TIDD:  Yeah, that's --

13             MR. SEITZER:  No objection to 1, 2, 3, and 5.

14             MR. TIDD:  The email stuff is out, the Stretto

15     upload --

16             MR. SEITZER:  Yes.

17             MR. TIDD:  -- I didn't even bother with.

18             MR. SEITZER:  And 5 is the one that has the VA

19     stuff and -- do you have it up?

20             MR. TIDD:  Yeah.  Do you want it up?

21             MR. SEITZER:  Yeah, let me see.

22             MR. TIDD:  5 is the VA and Social Security --

23             MR. SEITZER:  Yep, I'm fine with that, Your Honor.

24             MR. TIDD:  -- as well as the pension.

25             MR. SEITZER:  Yep.

1          THE COURT:  Okay.  All right.  So those will be

2     admitted, as well.

3          (Exhibits M-1 through M-3 received in evidence)

4          (Exhibit M-5 received in evidence)

5          MR. TIDD:  Do I have any redaction issues with that

6     or will I?  I shouldn't with an exhibit, right?

7          THE COURT:  You don't --

8          MR. SEITZER:  Well, are there Social Security

9     numbers on it?

10         MR. TIDD:  Yeah, I --

11         THE COURT:  Yeah, that's what I was going to ask.

12    Are there?

13         MR. TIDD:  Yeah, I was going to say -- because I

14    know they don't have the same protection as like a 121 form.

15         THE COURT:  So do you want to redact them and then

16    send me redacted versions?

17         MR. TIDD:  Yeah.

18         (Participants confer)

19         THE COURT:  I don't want them on the docket.

20         MR. TIDD:  Obviously, nothing will change on it.

21    I'll just scour them for any --

22         THE COURT:  Okay.

23         MR. TIDD:  Because I'm not sure if the VA claim

24    numbers match --

25         MR. SWARTZ:  It's my Social.

```
 1              MR. TIDD:  It is your -- okay.  Then it is a

 2     Social.  I wasn't sure the VA claim number was or not.

 3              MR. SEITZER:  And I have no objection to that.  I

 4     mean, that's perfectly reasonable, Your Honor.

 5              THE COURT:  Okay.

 6              MR. TIDD:  Do you want them to go to the same

 7     exhibit email only and I'll just label them as "redacted"?

 8              THE COURT:  Yes.

 9              MR. TIDD:  Okay.  But that will only be --

10              THE COURT:  Label them each -- like give me

11     individual PDFs.

12              MR. TIDD:  Yes.

13              THE COURT:  Yeah.

14              MR. TIDD:  Yeah, I'll take this one and break it up

15     into --

16              THE COURT:  Yes.

17              MR. SEITZER:  Well, your 5 is --

18              MR. TIDD:  But that will be --

19              MR. SEITZER:  -- the only --

20              MR. TIDD:  It will be --

21              MR. SEITZER:  -- one with --

22              MR. TIDD:  -- like sub 1 --

23              THE COURT:  No, no, no.

24              MR. SEITZER:  -- this issue.

25              MR. TIDD:  -- sub 2, sub 3.
```

1               THE COURT:  No.  It will be like -- M-5 is fine --

2               MR. TIDD:  Yeah.

3               THE COURT:  -- all together.

4               MR. TIDD:  Right.

5               THE COURT:  I just want to make sure that you're

6      not giving me M-1, 2, 3, and 5 as one PDF.

7               MR. TIDD:  No.  No, no, no.

8               THE COURT:  Okay.

9               MR. TIDD:  They're already --

10              THE COURT:  All right.

11              MR. TIDD:  -- separate.

12              THE COURT:  Okay.

13              MR. TIDD:  But are -- but do you want me to -- this

14     is going to be -- the income information is both debtors --

15              THE COURT:  Right.

16              MR. TIDD:  -- multiple sources.  Is that still okay

17     --

18              THE COURT:  Yeah, that's fine.

19              MR. TIDD:  -- as one PDF?  Because I referenced it

20     as one PDF.

21              THE COURT:  That's fine.

22              MR. TIDD:  Okay.

23              THE COURT:  That's perfectly fine.

24              MR. TIDD:  So 1, 2, 3, and 5.

25              MR. SEITZER:  Yes.

 1                    THE COURT:  1, 2, 3, and 5.

 2                    MR. TIDD:  And it will stay labeled as such, except

 3      for redacted.

 4                    THE COURT:  Okay.  Mr. Seitzer.

 5                    MR. SEITZER:  I have no further -- oh, for what,

 6      Your Honor?

 7                    THE COURT:  You're good?

 8                    MR. SEITZER:  For the argument or -- okay.

 9                    THE COURT:  Yes.

10                    MR. SEITZER:  Well, Your Honor, I put all the cases

11      in the objection to the motion to convert, Your Honor knows

12      them.

13                    We spoke about timing.  The motion to convert

14      wasn't filed until after the asset notice was filed, until

15      after my firm was employed as counsel to the trustee.

16                    The other biggest factor, in my book, has always

17      been and will always be the ability to confirm a Chapter 13

18      plan.

19                    And Your Honor will control as to what the

20      valuation of the real property is, not the -- what the

21      potential sale price of the real property is.  As my witness

22      testified, he thinks it will be over seven fifty.  You heard

23      the debtors' witness indicate it would be five eighty and

24      change.  Once again, Your Honor will decide that.

25                    Your Honor heard the testimony that they had very

1    little disposable income on a monthly basis, a few hundred

2    dollars, at best, every month.  Depending on how Your Honor

3    values the real estate, if it's anything of substance over

4    the five eighty, they won't be able to confirm a plan, they

5    won't be able to comply with 1325(a)(4).

6             So, once again, I think that's the biggest part,

7    but that depends on what Your Honor believes the valuation of

8    the property is.  If it goes anywhere above five eighty, I

9    don't think they can confirm a plan.  At seven fifty, with

10   closing costs and exemptions and things along those lines,

11   the amount of equity is anywhere between a hundred to

12   150,000.  So, if Your Honor values the property and, once

13   again, anything even a little bit over five eighty, they

14   probably can't confirm a Chapter 13 plan.

15            The other factors are really prejudice to

16   creditors.  The prejudice would be the creditors would likely

17   not get paid much, if anything, in a Chapter 13 case, based

18   upon what the -- well, once again, that's also going to

19   depend on Your Honor's valuation for the property, so it

20   really just depends on the valuation.

21            If Your Honor believes that it's valued at five

22   eighty, Your Honor is going to rule that they can convert to

23   Chapter 13.  But it's purely a valuation situation for Your

24   Honor --

25            THE COURT:  So let me ask --

1          MR. SEITZER:  -- because that's going to determine

2     prejudice --

3          THE COURT:  Right.

4          MR. SEITZER:  -- that's going to determine the

5     formulation and prosecution of a Chapter 13 plan, which will

6     bind them in some fashion.  But once again, if it's anywhere

7     even a little over five eighty, I don't think they can

8     confirm a plan.

9          THE COURT:  Does that take into account their

10    exemption?

11         MR. SEITZER:  Their current exemption is $5,000.

12    They can increase it.  But what I said --

13         THE COURT:  Right.

14         MR. SEITZER:  -- is a hundred to a hundred and

15    fifty, based on seven fifty.  That is taking into account --

16         THE COURT:  Yes.

17         MR. SEITZER:  -- the five twenty mortgage, the

18    seventy-five grand of closing costs, which is high, and also

19    fifty grand for exemptions.  So, if I'm doing that math

20    right, seven -- five twenty plus seventy-five is five ninety-

21    five, plus exemptions of fifty -- the exemptions aren't going

22    to be fifty, but it's over a hundred and twenty right there

23    because that math is the low six hundreds.

24         THE COURT:  Okay.

25         MR. SEITZER:  They're using a lot of (d)(5) to

1    protect a non-exempt car, and that's why they don't have or

2    won't have --

3              THE COURT:  But they would have twenty-nine a

4    piece.

5              MR. SEITZER:  No, no, twenty-seven nine.  But they

6    won't --

7              THE COURT:  Or twenty-seven nine.

8              MR. SEITZER:  They won't have that.  They currently

9    have five, but they can increase it.

10             THE COURT:  Right.

11             MR. SEITZER:  But it won't be -- I'm using fifty in

12   my analysis, but it won't be fifty, and the closing costs

13   won't be seventy-five grand, they'll be closer to seven or

14   eight percent and I'm using ten percent.

15             THE COURT:  Okay.

16             MR. SEITZER:  But those -- once again, Your Honor,

17   it just depends on valuation.  If Your Honor values it at six

18   fifty or even probably six hundred, they can't confirm a

19   plan.

20             THE COURT:  Okay.

21             MR. SEITZER:  Thank you, Your Honor.

22             THE COURT:  Thank you.

23             Mr. Tidd.

24             MR. TIDD:  I know you like the math.

25             THE COURT:  I do like the math.

1        MR. TIDD:  You like the math.  And the math is

2    different in a 13.

3        THE COURT:  I -- no, I understand that.

4        MR. TIDD:  As you're well aware.

5        THE COURT:  I do understand that.  I'm just trying

6    to figure out -- I did see that their exemption was like

7    5,700, but I presume that's because there wasn't really

8    anything left.

9        MR. TIDD:  It's like fifty-three and change, I

10   think.

11       THE COURT:  Yeah, there wasn't anything left.

12       MR. TIDD:  They didn't have to --

13       THE COURT:  But if the value was --

14       MR. TIDD:  -- exempt anything more.

15       THE COURT:  -- then they still have --

16       MR. TIDD:  Right.

17       THE COURT:  -- some room, I presume.

18       MR. TIDD:  Assuming, just for the sake of argument,

19   that Your Honor King Solomon'ed this case and cut it in half

20   and we took a hundred-and-sixty-six-thousand-dollar spread

21   and took 83,000 and put it on the value of five eighty-four.

22   That's 667,000, which, after Trustee Waterman's deduction of

23   20 percent --

24       THE COURT:  Yeah.

25       MR. TIDD:  -- is 533,600.  They still wouldn't have

1    to pay anything on that.  They could do -- a plan is

2    imminently conformably because all they simply have to do, as

3    is Trustee Waterman's practice in cases like this, is offer

4    him something he's willing to accept.  That's generally 50 to

5    $100.  The work in the case is done, the plan would be very

6    simple.  Unsecureds get whatever is left over after 50 a

7    month, as an example.

8                    THE COURT:  Right.

9                    MR. TIDD:  In fact, we could go up to a value of

10   $720,000, $720,030 and wind up with still owing nothing after

11   Trustee Waterman's discount for sale.

12                   And we're not concerned about the Subaru, I'm just

13   saying that's an absurd example, and I don't think that -- I

14   think, with the way that we -- I don't want to use the word

15   "attacked" -- but challenged the CMA, I don't think seven

16   twenty would be appropriate.  But even if you cut it in half

17   and took the imminently easy way out -- not that you would

18   look to just take the easy way out -- but it's still they get

19   nothing.

20                   And when you look at the prejudice issue:  Homeless

21   versus them getting something, creditors getting something.

22   Well, okay, and I don't think that that's an acceptable

23   alternative.  I think the burden that they're going to bear

24   is much greater than the burden on the credit card companies

25   not getting anything --

1          THE COURT:  Okay.

2          MR. TIDD:  -- little to nothing.

3          Now, with respect -- and I've already addressed, on

4    the way to that last point, confirmable plan.  It can be

5    done.

6          Now the effect of conversion on the "efficient,"

7    quote/unquote, administration of the bankruptcy process, the

8    argument always is -- and I don't blame anybody for making

9    the argument -- well, they get paid faster in a 7 than they

10   do in a 13.  Well, everybody would get paid faster in a 7 on

11   an equity-based plan.  I'm not really sure why that still

12   exists as a point of contention or as an element.

13         And would conversion further an abuse of the

14   bankruptcy process?  No, not in this case.  The facts of this

15   case are unique.  The value of this property was obtained

16   carefully, methodically, at a cost to the debtors.  They

17   followed my advice to the letter.  I watched his property

18   value over time.  We had this appraisal updated twice and

19   then went with the final to minimize risk as much as

20   possible.

21         I did not go with a Zestimate or anything like it.

22   I did not go with a CMA or a BPO at all.  A licensed

23   appraiser did everything.  He wasn't told what number I

24   needed, as he said, he was told go do it, what did you get.

25   And it works.  And the math works in their favor the entire

1    way through.

2              And going back, all the way back, to the first

3    point, with respect to our burden to prove that it's in good

4    faith, we have no evidence of any untruthfulness in the

5    petitions, schedules, statements, nothing.  There's been no

6    accusation, nor is there any.  Extreme care was taken in

7    getting this appraisal.

8              The timing, I don't see -- I could see how timing

9    would be an issue if, right before sale, as is often the

10   case, oh, well, now I'm going to convert to a 13.  But as

11   soon as we realized that there was an issue, it was

12   converted.  I got no response as to hey, can we talk, it was

13   just it was filed.  I'm not blaming anybody for filing it.

14   But I knew where it was going at that point, that's the time

15   I knew that okay, no one wants to talk about it, now I have

16   to file the motion to convert.  So there's nothing nefarious

17   in any of the timing of any of the filings in this case,

18   especially the notice to convert, the application to convert.

19              THE COURT:  Okay.

20              MR. TIDD:  All right?

21              THE COURT:  All right.  Thank you both.

22              MR. SEITZER:  May I just have five seconds, Your

23   Honor --

24              THE COURT:  Sure.

25              MR. SEITZER:  -- about this math issue?

1          THE COURT:  Sure.

2          MR. SEITZER:  1325 --

3          THE COURT:  "Math," is that what you said?

4          MR. SEITZER:  Math issue, yeah.

5          THE COURT:  Okay.

6          MR. SEITZER:  Yeah, 1325(a)(4), best interests of

7    creditors in a Chapter 13 case, where creditors have to get

8    what they would get in a Chapter 7.  With all due respect to

9    Mr. Waterman, it doesn't matter that he does 10 percent of 20

10   percent or 30 percent, creditors would still -- that 10, 20,

11   30 percent doesn't matter.  It shouldn't come into play at

12   all.  And this 50 to 100 bucks shouldn't come into play at

13   all.  It should be what they would get in a Chapter 7 case,

14   not what they're going to get in the Chapter 13 case.

15         MR. TIDD:  And if I can reply?  We've heard Trustee

16   Waterman, both himself, I believe, and through his

17   representatives, that the 20 takes into account the cost of

18   sale, as -- and I'm sure, as you're well aware, and the

19   anticipated stepping for all those stepping down trustee fees

20   --

21         THE COURT:  Uh-huh.

22         MR. TIDD:  -- for the Chapter 7.  So that's why he

23   makes it work that way.  So I know that you know that, I just

24   feel it needs to be said.

25         THE COURT:  Understood.

1          MR. SEITZER:  No, I'm well aware why they do it.

2     I'm just saying it shouldn't come into play for this

3     scenario.

4               THE COURT:  Understood.

5               Okay.  I am going to take this under advisement.  I

6     wasn't going to, but you have given me enough to think about

7     that I am going to do that, and so you're going to have to

8     give me some time.  Presumably, I won't --

9               MR. TIDD:  Well, wait.  Who gave you something to

10    think about?  That's been the --

11       (Laughter)

12              MR. TIDD:  That's --

13              THE COURT:  Wouldn't you like to know?

14              So I will -- again, I'll review everything and

15    hopefully have my decision out to you shortly, so I --

16              MR. TIDD:  Thank you, Your Honor.

17              THE COURT:  All right.  Thank you both.

18              MR. SEITZER:  Thank you.

19       (Court and court personnel confer)

20       (Proceedings concluded at 2:19 p.m.)

21                              *****

22

23

24

25

1                            CERTIFICATION

2            I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10

11   _____        March 25, 2025

12   Coleen Rand, AAERT Cert. No. 341

13   Certified Court Transcriptionist

14   For RedDoor Legal Services, LLC

15

16

17

18

19

20

21

22

23

24

25