**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: Dennis Lynn Swartz, Jr. | | |
| and Wendy May Swartz, | : | Chapter 7 |
| | : | |
| Debtors. | : | Bky. No. 24-14190 (PMM) |
| | : | |
| _____ | : | |

# O P I N I O N

## I.   INTRODUCTION

Dennis and Wendy Swartz (the "Swartzs" or the "Debtors") filed for chapter 7

bankruptcy protection last year, seeking to free themselves of a heavy debt burden.  The Swartzs,

who have lived in their home located at 815 Texter Mountain Road in Robesonia, PA (the

"Property") for nearly ten (10) years, are neither young nor in good health.  The Property is

customized to accommodate the couple's physical challenges and also houses their adult son and

at times their adult daughter.  The Swartzs did not choose to file under chapter 7 of the Code

lightly; they paid for an appraisal of the Property prior to filing to make sure that the equity in

their home—if any—was not significant enough to warrant filing under chapter 13.  The Debtors

were careful to proceed in a way that precluded the sale of their family home.

Yet shortly after the filing, the chapter 7 trustee (the "Trustee") alerted the Debtors that,

due to the alleged value of the Property (much higher than that claimed by the Debtors), she

intended to administer the estate as an asset case.  The Property would be liquidated in order to

make a distribution to creditors.  Seeking to avoid this, the Debtors filed a Motion to Convert to

Chapter 13 (the "Motion"), to which the Trustee promptly objected.

An evidentiary hearing which focused on the value of the Debtors' Property was held on

March 11, 2025.  Upon review of the relevant law as well as the testimony and evidence

1

presented at the hearing, the Court holds that the Property is worth what the Debtors claim: $584,000.00.  Due both to this critical fact and the absence of any evidence supporting bad faith on the part of the Swartzs, the Objection will be overruled and the Motion granted.

## II.  FINDINGS OF FACT

These findings are based on the credibility of the witnesses, the plausibility of their testimony, and upon review of the relevant evidence.

### Background

1.  The Debtors filed for chapter 7 bankruptcy protection on November 21, 2024.

2.  On February 13, 2025, notice was provided that the case was being administered as an asset case.

3.  Four (4) days later, the Debtors filed the Motion to Convert to Chapter 13, to which the Trustee filed an Objection.

4.  On February 26, 2025, an Order was entered granting the employment of Karalis PC as counsel to the chapter 7 trustee.[1]

5.  On March 11, 2025, an evidentiary hearing was held and concluded with regard to the Motion and Objection.  Four (4) witnesses testified at the hearing: the Debtors, Ryan Achenbach, a real estate appraiser, and Peter Decembrino, a real estate agent.

### The Debtors and their Representation

6.  Wendy Swartz ("Mrs. Swartz") is a registered nurse who is on social security disability due to multiple sclerosis.  Tr. at 54.

---

[1] For ease of reference, counsel to the chapter 7 trustee will be referred to as the "Trustee."

7.  Dennis Swartz ("Mr. Swartz") is medically retired after twenty-eight years of service with
    the U.S. Army and Pennsylvania National Guard due to the fact that he was diagnosed with
    stage four neuroendocrine cancer.  Tr. at 68-70.

8.  The Debtors first consulted their counsel, David Tidd, in May of 2024, about six (6) months
    prior to filing.  Tr. at 53.  The Debtors and Mr. Tidd met approximately five (5) times and
    reviewed the petition at least twice prior to filing.  Tr. at 59.

9.  In advance of filing under chapter 7, the Debtors and counsel considered that if the Debtors
    had a significant amount of equity in the Property, a chapter 13 bankruptcy would make more
    sense.  Tr. at 56-58.

## Property and Monthly Finances

10. In addition to the Property, the Swartzs own one (1) car (a Subaru) worth $22,224.00.

11. The Debtors exempted $5,376.00 pursuant to §522(d)(1) of the value of the Property and the
    full value of the car pursuant to §522(d)(2) and §522(d)(5).

12. The Debtors owe $283,456.00 in unsecured debt.

13.  Neither of the Debtors is currently employed; their scheduled monthly income of $7,110.50
    comes from the social security that both Debtors receive of approximately $2,500.00 per
    month and Mr. Swartz's monthly veteran's disability and pension.  Doc. #13, Amended
    Schedule I; Tr. at 54, 63, 75; Ex. M-5.

14. Schedule I does not include all the Debtors' income because certain income is exempt due to
    the HAVEN Act.[2]  Tr. at 63.

---

[2]      The Honoring American Veterans in Extreme Need Act of 2019 ("HAVEN Act"), Public Law 116-52,
excludes certain benefits paid to veterans or their family members from the definition of Current Monthly Income
found in the Bankruptcy Code.  11 U.S.C. § 101(10A).

15. Approximately $426.00 of Mr. Swartz's income comes from a pension that is not exempted under the HAVEN Act.  Tr. at 76.

16. The Debtors' monthly expenses amount to $7,110.50.  Doc. #14, Amended Schedule J.

17. The Debtors' monthly disposable income is between $150.00 and $200.00.  Tr. at 64-66, 83.

18. The Debtors have one son and one daughter.  Their son lives with them while attending college; their daughter is deployed in Africa and lives in the Property when she is home.  Tr. at 81-82.

### The Property

19. The Debtors purchased the Property in or around 2016 for approximately $465,000.00.  Tr. at 81.

20. The Debtors' Schedule A/B values the Property at $525,600.00 and notes that this figure is derived from the appraised value of $584,000.00 less 10% cost of sale.  Doc. #1.

21.  There are two (2) mortgages on the Property: one to Tompkins Community Bank in the amount of $402,578.00 and one to Members 1st FCU in the amount of $117,646.00.  Doc. #1, Schedule D; Tr. at 83-84.

22. The primary dwelling on the Property is a two-story, "builder-grade" house with wood siding, a shingled roof, an attached garage, and a finished basement (which houses a separate bedroom, bathroom, and kitchenette).  The home has three (3) bedrooms and two (2) bathrooms.  Tr. at 24, 27.[3]

23. The Property still uses an original 30-year-old septic system and contains a dilapidated cabin—a caved-in cinder block structure on a cracked concrete pad.  Tr. at 80.

---

[3]       The home has a bedroom and bathroom on the first floor to accommodate the Swartzs' disabilities.  Tr. at 55, 60, 78.

4

24. The Property has two (2) lots, spanning two (2) counties and three (3) townships with land
that is rural and mostly vacant.  Tr. at 20-23.

25. The main dwelling sits on 14 acres of land and has an attached garage and deck, a family
garden, and a pool.  Tr. at 20-21, 31.

26. In addition to the 14 acres on which the home sits, the Property contains an additional 13
acres of "tagalong" or "excess" land (the "Excess Land").  Tr. at 30-31, 81.

27. The Debtors therefore own a total of 27 acres, most of which is heavily wooded and not
tillable or rentable.  Tr. at 34, 41-42.[4]

28. On or around June 26, 2024, the Debtors, via their counsel, ordered an appraisal of the
Property to be performed by Ryan Achenbach.  Tr. at 18.

## Valuation

*Debtors' Valuation*

29. Mr. Achenbach, a certified, registered real estate appraiser, has been employed in the
industry for more than twenty (20) years.  Tr. at 13.  He testified as an expert witness who
follows the protocol of the American National Standards Institute (ANSI).  Tr. at 18, 25.

30. Mr. Achenbach has appraised hundreds of properties.  Tr. at 48.

31. Mr. Achenbach provides property appraisals, which is an analysis distinct from a "broker's
price opinion."  Tr. at 14.

32. Mr. Achenbach's standard analysis involves walking the land, inspecting the house, looking
at sales history, and then finding comparable properties—properties that are similar in age,
land size, location, and condition.  Tr. at 15-17.

---

[4]     Mr. Achenbach testified that although the Excess Land is not valuable, it "could be sold for something,"
maybe $32,000.00.  Tr. at 49.

33. In order to appraise the Property, Mr. Achenbach inspected and walked the 14-acre exterior land, inspected each room, looked at the building materials, and measured rooms.  Tr. at 19.

34. Mr. Achenbach researched the sales data in the relevant township for the prior five (5) years, discovering that the average "predominant" value was $290,000.00.  Tr. at 23.  He also researched zoning restrictions.  Tr. at 24.

35. Mr. Achenbach reviewed comparable houses ("comps") in a ten (10) mile radius from the Property that were carefully selected to consider the uniqueness of the Property and its rural location, as well as the specific condition of each home.  Tr. at 26-28, 34, 50, 122-123.

36. The estimate also involved pulling historic property records.  Tr. at 35.

37. The Excess Land could be sold as a separate parcel; however, because it is heavily wooded, landlocked, and has a stream running through it, it does not add much value to the Property. Tr. at 31-33, 49, 80.

38. Mr. Achenbach spent 10-12 hours appraising the Property (nearly twice as long as he usually spends) because this was a "difficult assignment."  Tr. at 36, 46.  His fee, however, was not higher than normal.  Tr. at 46.

39.  On July 16, 2024, Mr. Achenbach provided a signed appraisal (the "Appraisal") of the Property showing that the Property was worth $584,000.00.  Tr. at 22; Ex. M-1.  Mr. Swartz concurred with this estimate.  Tr. at 80.

40.  Mr. Achenbach updated the Appraisal twice: three (3) months later on September 22, 2024, and again on February 4, 2025: the value did not change.  Tr. at 37-39, 47; Ex. M-2; Ex. M-3.

41.  In his analysis of the Property's value, Mr. Achenbach considered and distinguished the "Zestimate" of $769,300.00 provided of the Property by Zillow.com.  Tr. at 40, 122-23.

42. According to Mr. Achenbach, "the Zillow proprietary algorithm is most accurate in
homogenous markets," such as a city or highly populated area.  Tr. at 40-41, 43, 122.

*Trustee's Valuation*

43. Peter Decembrino, a real estate agent who was not qualified as an expert, testified for the
Trustee regarding valuation of the Property.

44. Mr. Decembrino inspected the inside and outside of the Property and was favorably
impressed with the full basement.  Tr. at 97-98.

45. Mr. Decembrino considers the Property to be "very nice," in an "extremely desirable"
location, and to be a "little haven back in the woods."  Tr. at 97-98, 102.

46. In early February 2025, Mr. Decembrino valued the Property at $750,000.00.  Tr. at 99-100,
102, 106; Ex. T-4.

47. The valuation was performed by looking at comps and reviewing the median sale price of
homes in the area.  Tr. at 101-02; Ex. T-4.

48. Mr. Decembrino did not photograph the Property, nor did he walk the land or take any notes
regarding the interior.  Tr. at 103.  The Comparative Market Analysis Report does not
include any pictures of the Property.  Ex. T-4.

49. Mr. Decembrino did not review the deed for the Property, was not aware of its precise
location, and lacked a full description of the land.  Tr. at 108.

50. Mr. Decembrino did not realize that the Property contains 27 acres; Mr. Decembrino thought
the land was 18 acres.  Tr. at 98, 107, 109.

51. Mr. Decembrino had limited knowledge of the comps used for his valuation; he did not know
that three (3) of the properties had been sold at auction, one (1) is a registered historical
estate, and one (1) had notable features making it an inappropriate comp.  Tr. at 104-05.

52. Mr. Decembrino criticized the Appraisal because only three (3) comps were considered and none were more than ten (10) acres.  Tr. at 99.

## III.  THE PARTIES' ARGUMENTS

The Trustee's starting and central point is that the Property is worth approximately $200,000.00 more than the Debtors indicate and thus there "appears to be significant equity . . . for the benefit" of and meaningful distribution to creditors. Doc. #19, the "Objection" at 2-3. The Trustee argues that the fact that the Debtors sought to convert only after the case was deemed an asset case is evidence of bad faith.  Objection at 6; Tr. at 128-29.  The Debtors "have not been forthcoming with the Bankruptcy Court and creditors."  Objection at 6.  Further, the Trustee maintains that because there is significant equity in the Property, the Debtors will not be able to satisfy the best interest of the creditors test, 11 U.S.C. §1325(a)(4).  Tr. at 129, 136; Objection at 7.

The Debtors insist that that they have acted in good faith, seeking to convert only after realizing that the Trustee intended to sell their home and once communication with the Trustee proved fruitless.  Tr. at 135.  The unique qualities of the Property were studied carefully and the value meticulously examined and re-examined.  Tr. at 134.  Further, the Debtors argue that even if the value of the Property is higher than their estimate, they can readily confirm a chapter 13 plan.  Tr. at 133.  There is no prejudice to creditors when one balances the equities.  Tr. at 133-34.

## IV.  LEGAL STANDARD

Section 706 of the Code provides that a "debtor may convert a case under this chapter to a case under chapter . . . 13 of this title at any time, if the case has not been converted . . . ." 11 U.S.C. §706.  The language of the statute is permissive and not absolute.  See Marrama v.

8

Citizens Bank of Massachusetts, 549 U.S. 365, 374-76 (2007).  The right to convert is ultimately

conditioned on the debtor's ability to qualify as a chapter 13 debtor.  Id. at 372-73.  Marrama

held that a debtor who acted in bad faith to conceal assets would be subject to immediate

dismissal under §1307(c) and therefore did not have the right to convert.  11 U.S.C. §706(d);

6 Collier on Bankruptcy ¶706.02 (16th 2025); In re Bocourt, 2023 WL 3184370, at *2 (Bankr.

E.D. Pa. Apr. 30, 2023) ("Whether to permit a Chapter 7 debtor to convert to Chapter 13 is

within this Court's discretion based upon conclusions regarding bad faith and the ability to fund

a Chapter 13 plan.").

Specifically, in deciding whether a debtor should be permitted to convert to chapter 13,

courts examine the following factors:

> (i) whether the debtor is seeking to convert to chapter 13 in good faith (including a
> review of facts such as the timing of the motion to convert; the debtor's motive in filing
> the motion; and whether the debtor has been forthcoming with the bankruptcy court and
> creditors);
>
> (ii) whether the debtor can propose a confirmable chapter 13 plan;
>
> (iii) the impact on the debtor of denying conversion weighed against the prejudice to
> creditors caused by allowing conversion;
>
> (iv) the effect of conversion on the efficient administration of the bankruptcy estate; and
>
> (v) whether conversion would further an abuse of the bankruptcy process.

In re Tufano, 2011 WL 1473384, at *4 (Bankr. M.D. Pa. Apr. 19, 2011) (citing In re Piccoli,

2007 WL 2822001, *7 (E.D. Pa. 2007 Sept. 27, 2007)); In re Campbell, 598 B.R. 775, 778

(Bankr. M.D. Pa. 2019), aff'd sub nom. Campbell v. Conway, 611 B.R. 38 (M.D. Pa. 2020).

## V.  VALUATION OF THE PROPERTY

The value of property and the corresponding amount of equity a debtor has in his home is

not necessarily a relevant factor with regard to the test outlined above.  But in cases such as this,

in which the Trustee alleges that the Debtors' conversion Motion was filed in bad faith in order

to protect home equity, the central question is, in fact, the value of the Property.  The evidentiary

hearing focused on this issue: is the Property worth enough that a forced distribution of the

equity makes sense?  The parties' estimates are not close: the Debtors offered evidence that the

Property is worth $584,000.00 and the Trustee's witness claims the home is worth $750,000.00.

As discussed in a recent opinion of this Court, determining how much property is worth

is "not an exact science, and a court has broad discretion in determining value."  In re

Lewisberry Partners, LLC, 664 B.R. 398, 400 (Bankr. E.D. Pa. 2024); accord In re Hernandez,

493 B.R. 46, 50 (Bankr. N.D. Ill. 2013).  While there is no prescribed method for determining

value when faced with conflicting appraisal testimony, a court should consider "the appraiser's

education, training, experience, familiarity with the subject of the appraisal, manner of

conducting the appraisal, testimony on direct examination, testimony on cross-examination, and

overall ability to substantiate the basis for the valuation presented."  In re Gurnari, 664 B.R. 104,

111 (Bankr. M.D. Pa. 2024) (citation omitted); see also Hernandez, 493 B.R. at 50 ("A judge

should look to the accuracy, credibility and methodology employed by the appraisers." (citation

omitted)).

Preliminarily, it is also worth noting that because of the extensive training and

experience, a valuation by an appraiser is given more weight than that of a real estate broker.

See In re Morse, 2018 WL 6721090, at *6 (Bankr. N.D.N.Y. Dec. 20, 2018) ("an assessment of

the fair market value of a real estate parcel by an appraiser carries greater weight than that of a

real estate broker who does not have the same specialized training" (quoting In re Pichardo, 2013

WL 1352308, at *4 (Bankr. D.R.I. Apr. 3, 2013)).  Mr. Achenbach, who testified for the Debtors,

is a certified expert real estate appraiser, whereas Mr. Decembrino, the Trustee's witness, is not

an expert.

With these factors and a dose of common sense in mind, the appraisal of Mr. Achenbach can be credited in its entirety. In re TIAT Corp., 2017 WL 161675, at *8 (Bankr. D. Kan. Jan. 13, 2017) (a court can fully or partially accept an appraisal). Mr. Achenbach's analysis of the value of the Property was based on a meticulous review of the home and land on which it sits. He walked the exterior of the Property and measured each room.  Finding of Fact 33.  Mr. Achenbach carefully researched the sales and zoning history of the area, even reviewing historic property records, in order to determine which homes would be most comparable in their value. Findings of Fact 34-36.  He thoughtfully detailed the reasons for concluding that the Excess Land is not valuable.  Finding of Fact 37.

The Trustee's valuation witness, on the other hand, did not perform a careful review.  In fact, Mr. Decembrino seemed to have little knowledge of the Property, which is a unique structure in a remote location.  He testified, for example, that the home was "very nice," despite credible evidence that the Property is partly dilapidated and in need of repair.  Findings of Fact 23, 45.  Mr. Decembrino's visit to the Property was far from thorough; he took neither pictures nor notes.  Finding of Fact 48.  He failed to review the deed and did not know of the exact location or size of the Property.  Findings of Fact 49, 50.  Cross-examination revealed that Mr. Decembrino had little working knowledge of the properties he used as comps for his assessment, failing to realize the condition, size, and method of sale of these properties.  Finding of Fact 51.

In sum, the appraisal report provided by Mr. Decembrino resembled the kind of "Zillow estimate" that Mr. Achenbach credibly discounted as being unreliable outside of homogenous markets.  Finding of Fact 42.  For these reasons, the Court fully credits Mr. Achenbach's testimony and finds that the Property is worth $584,000.00.

11

# VI. DISCUSSION

## A.  Good faith

The next issue is whether the Debtors have sought to manipulate the system.  In analyzing whether §706 of the Code automatically allows conversion from chapter 7 to chapter 13, the Supreme Court in <u>Marrama</u> declined precisely to define whether a debtor has acted in good faith; but the Court did give a clue:

> We have no occasion here to articulate with precision what conduct qualifies as 'bad faith' sufficient to permit a bankruptcy judge to dismiss a Chapter 13 case or to deny conversion from Chapter 7. It suffices to emphasize that <u>the debtor's conduct must, in fact, be atypical. Limiting dismissal or denial of conversion to extraordinary cases is particularly appropriate</u> in light of the fact that lack of good faith in proposing a Chapter 13 plan is an express statutory ground for denying plan confirmation. 11 U.S.C. § 1325(a)(3).

<u>Marrama</u>, 549 U.S. at 375 n.11 (emphasis added).  Lower courts have fleshed out the idea that denial of conversion is limited to circumstances in which a debtor acts blatantly in defiance of norms.  <u>E.g.</u>, <u>In re Woodberry</u>, 2021 WL 2660488, at *2 (6th Cir. Mar. 18, 2021) ("In deciding a motion to convert, the bankruptcy court has the authority to police the integrity of its proceedings and look to the totality of the circumstances."); <u>In re Condon</u>, 358 B.R. 317, 323 (B.A.P. 6th Cir. 2007) (behavior warranting a finding of bad faith is almost always "shockingly egregious"); <u>In re Demeza</u>, 567 B.R. 473, 477 (Bankr. M.D. Pa.), <u>aff'd sub nom.</u> <u>Hackerman v. Demeza</u>, 576 B.R. 472 (M.D. Pa. 2017) ("Dismissal or conversion should be reserved for 'those egregious cases that entail concealed or misrepresented assets and/or sources of income, lavish lifestyles, and intention to avoid a large single debt based upon conduct akin to fraud, misconduct or gross negligence.'") (quoting <u>In re Perlin</u>, 497 F.3d 364 (3d Cir. 2007)).

12

A finding of a debtor's bad faith is a critical, often dispositive, determination and, consequently, must be made upon a careful examination of the facts of each case.[5]  The timing of a motion to convert is not in itself necessarily an indication that a debtor's motives are questionable.  See In re Murray, 377 B.R. 464, 469 (Bankr. D. Del. 2007) (with regard to a motion to convert, "a court should consider the totality of the circumstances 'including a review of facts such as . . . the timing of the motion . . . the debtor's motive in filing the motion; and . . . whether the debtor has been forthcoming with the bankruptcy court and creditors.") (quoting In re Pakuris, 262 B.R. 330, 335 (Bankr. E.D. Pa. 2001)); Piccoli, 2007 WL 2822001, at * 6-7.

In Marrama, for example, the debtor intentionally provided incorrect information on his schedules about the value of his home and whether the property had been transferred.  549 U.S. at 368.  The debtor had transferred the property to protect it from creditors.  Id.  The debtor then sought to convert his case to chapter 13 in order to avoid the chapter 7 trustee's efforts to recover the property for the benefit of chapter 7 creditors.  Id. at 369.  It was these circumstances that pointed to the debtor's lack of good faith.  Id. at 370.

Here, the Trustee asserts that the fact that the Property is worth considerably more than the Debtors indicate, combined with the timing of the Motion (immediately after the chapter 7 was deemed an asset case), indicates that the Debtors are not acting in good faith.  The Trustee insists the Swartzs are trying to hide or get away with something.  See Objection at 6 (the Debtors "have not been forthcoming with the Bankruptcy Court and creditors").  The validity of this argument depends entirely on whether the Trustee is correct about the value of the Property.

---

[5]    Once the moving party presented sufficient evidence, it is a debtor's burden to show good faith.  In re Tamecki, 229 F.3d 205, 207 (3d Cir. 2000).

In other words, we can only conclude that the Debtors intended to conceal assets if there's equity in the Property worth concealing.

The conclusion that the value of the Property is worth what the Debtors claim means that the Trustee's argument fails.  As detailed, the Debtors carefully pursued a thorough and competent appraisal of the Property.  The fact that the appraisal was updated twice in a seven (7) month period belies the Trustee's assertion that the Debtors motives were nefarious.  Further, there is no indication that the timing of the Motion is suspicious.  The Debtors sought to convert only once the Trustee indicated her intention to liquidate their assets and sell their home.  See Murray, 377 B.R. at 470 ("the Debtor moved to convert his case because the United States Trustee forced him to do it").  Courts have thus recognized instances where a debtor's decision to convert was made in good faith and only in response to a trustee's overzealous attempt to sell property. This is true here. The irony of the Trustee scaring the Debtors out of a liquidation plan and then pointing to this flight as evidence of their ill motives is not lost on this Court.

### B.  Ability to Confirm a Chapter 13 Plan

The next consideration is whether chapter 13 is a viable option for the Debtors.  This inquiry requires a determination both that the Debtors are eligible wage-earners,[6] and whether they can confirm a chapter 13 plan. See 11 U.S.C. §109(e); In re Lopez, 2015 WL 5175471, at *2 (B.A.P. 9th Cir. Sept. 3, 2015), Here, there is no dispute that the Debtors have regular income[7] and that their liquidated debts are within the prescribed limit.  The remaining dispute is

---

[6]     While separate analyses, the question of whether a debtor has regular income is closely tied to whether a plan is feasible under §1325(a)(6).  2 Collier on Bankruptcy ¶109.06 (16th 2025).

[7]     The "regular income" does not need to be from employment; income may come, as here, from social security or disability payments.  2 Collier on Bankruptcy ¶109.06 (16th 2025).

thus whether the Debtors can succeed in chapter 13. If the Debtors cannot confirm a chapter 13 plan, then conversion would "serve no point." Pakuris, 262 B.R. at 337; see also Tufano, 2011 WL 1473384, at *6.

The Code requires that creditors receive as much via a debtor's chapter 13 as they would receive in a chapter 7 liquidation. 11 U.S.C. §1325(a)(4). The question of whether the Debtors can confirm a plan requires a further determination of whether they "will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. §1325(a)(6).[8] Confirmation of a chapter 13 plan is, in turn, conditioned "on the debtor's promise to use all of his disposable income during the plan period to make plan payments." In re Hardy, 2025 WL 848256, at *3 (Bankr. N.D. Ill. Mar. 18, 2025); 11 U.S.C. §1325(b)(1)(B).[9] A court must consider not only whether a debtor will be able to make the payments, but also whether the proposed budget is realistic. In re Harris, 497 B.R. 652, 666 (Bankr. D. Mass. 2013); In re Masterson, 141 B.R. 84, 88 (Bankr. E.D. Pa. 1992) (noting that §1325(a)(6) requires only that the proposed budget and anticipated income to satisfy that budget are "realistic"). It is not a Bankruptcy Court's job to craft a chapter 13 plan or to dictate reasonable expenses. 8 Collier on Bankruptcy ¶1325.07 (16th 2025) ("Even when the court has serious doubts about feasibility, these debtors should usually be given a chance to attempt their proposed plan").

The Debtors here have not yet proposed a chapter 13 plan; the quarrel between the parties is thus about whether such a plan is in fact proposable. The Court finds that the Debtors have provided sufficient evidence that chapter 13 is a viable option for at least two (2) reasons.

---

[8]     Some courts analyze Chapter 13 feasibility as part of a good faith analysis. Other courts consider feasibility as to whether or not there is "cause" for conversion of the case. See Campbell, 598 B.R. at 783.

[9]     Disposable income is calculated in accordance with §1325(b)(2).

First, contrary to the assertion of the Trustee, the Debtors can satisfy the "best interests of the creditors test" found in §1325(a)(4).  In other words, creditors will not be harmed by conversion to chapter 13.  The Property is worth $584,000.00; the permitted 10% cost of sale calculation would allow about $525,600.00 for distribution.  Tr. at 7, 131.  The two (2) mortgages on the Property amount to about $520,000.00 in secured debt.  Finding of Fact 21.  The remaining small sum of $6,000.00 can easily be exempted by the Debtors.  11 U.S.C. §522(d)(1).[10]  Thus the Swartzs will not have to satisfy a non-exempt equity amount in chapter 13; there is no non-exempt equity.  This conclusion means that creditors will receive in chapter 13 as much or more than they would have been paid in a chapter 7.  See 8 Collier on Bankruptcy ¶1325.05 (16th 2025) (stating that in "nominal asset cases . . . most courts . . . would discourage a chapter 7 trustee from administering the estate at all . . . . It follows, then that in nominal asset chapter 13 cases, the unsecured creditors are entitled to no minimum amount of payments under section 1325(a)(4).").  This principal, that a trustee should be mindful of the effects of attempting to squeeze a distribution from a tiny or non-existent estate, is fleshed out below.

Second, the evidence shows that the Swartzs are likely to offer a feasible budget and make plan payments accordingly.  The Debtors receive a majority of their income from social security and veteran's disability, neither of which is used to calculate a disposable income for the purposes of chapter 13.  See 11 U.S.C. §522(d)(10); Bankruptcy Form B 122C-1; HAVEN Act.  Mr. Swartz also receives a pension payment of $426.52 per month, which is not exempt.  The Debtors are "below median" for purposes of the chapter 13 means test.  See Bankruptcy Forms B 122C-1, 122C-2.  Their expenses amount to approximately $7,110.50 per month.  Finding of Fact 16.  Mrs. Swartz testified that the Debtors usually have between $150.00 to $200.00 left

---

[10]    Counsel for the Trustee conceded that the Debtors can amended Schedule C to do so.  Tr. at 130-31.

each month after paying their expenses.  Finding of Fact 17.  A portion of this amount, as determined in consultation with the Chapter 13 Trustee's office, can be used to fund a chapter 13 plan.  Tr. at 8, 11.

In fact, the Trustee readily agreed that a feasibility issue essentially disappears if the Property is valued less than $600,000.00.  Tr. at 129 ("If Your Honor believes that [the Property] is valued at 580, Your Honor is going to rule that they can convert to chapter 13.  But it's purely a valuation situation for Your Honor.").[11]

Because creditors will get paid at least as much as they would in a chapter 7 and because the Debtors otherwise have the ability to propose a feasible plan in good faith, conversion is not precluded by an inability to succeed in chapter 13.

### C.  Remaining Elements

The above discussion allows a conclusion that the remaining three (3) points of consideration are satisfied here in favor of allowing conversion.  First, the impact on the Debtors in denying the Motion is more compelling than the prejudice to creditors by allowing conversion.  As discussed, creditors will not be prejudiced; in fact, they may well be in a better position, given the fact that they were likely to receive nothing in a chapter 7 liquidation.  However, maintaining the status quo of an asset chapter 7 liquidation would cause harm to the Debtors.  See Tr. at 60 (just hearing that the Property might be sold is "upsetting."); Tr. at 79 (discussing the housing needs associated with the Debtors' disabilities, and that a move would be "devastating" for the Debtors).

---

[11]  The Trustee did not make a serious argument that the Debtors' income would not allow funding of a chapter 13 plan.  Remarkably, although the Trustee vehemently opposes conversion to chapter 13 and contends that a plan is not confirmable, counsel did not have complete knowledge of the Debtors' income.  Tr. at 63.

Second, conversion would not adversely affect the efficient administration of the

bankruptcy estate. The chapter 7 case has not been pending for long and the Trustee has not yet

taken steps to liquidate assets.  See Tufano, 2011 WL 1473384, at *7.

Finally, because the Debtors have not proceeded in bad faith, there has been and will be

no abuse of the bankruptcy process.

For all these reasons, the evidence presented as well as the balance of equities

demonstrate that the Debtors should be allowed to convert to chapter 13.

### D.  Policy Considerations

The conclusion that the Debtors may proceed in chapter 13 has come with delay and

expense to the Debtors.  The threat of being forced to list their home for sale in a chapter 7 led to

briefing of the issue, an evidentiary hearing at which both Debtors and their expert appraiser

(along with the Trustee's realtor) testified, and the issuance of this written opinion which

includes a summary of the legal standards, a review of the relevant facts and procedural history,

and an application of the law to the facts.  Carefully analyzing competing positions and

adjudicating the outcome is, to be sure, the role of a court.  But in a case such as this, in which

review shows little basis for the Trustee's underlying objection, we must question the

appropriateness of the dispute in the first place.  Comments in a recent opinion finding that the

chapter 7 trustee could not claw back a debtor's workman's compensation are relevant:

> The Debtors are already living on the edge; denial of the $68,000.00 Compensation
> Payment might well push them into poverty and would almost certainly deny them the
> fresh start promised by the bankruptcy proceeding.  A chapter 7 trustee's job, of course,
> is to recover funds in order to enhance distribution to creditors.  To further this pursuit,
> the trustee enjoys the benefit of certain statutory tools, including the ability to object to
> claimed exemptions and to avoid and recover transfers by and from the debtor.  In this
> case, however, in which there is a thin legal basis for denying the Debtors a small sum
> meant to provide for basic needs, I question whether the Trustee has made prudent use of

18

those tools.

In re Buffenmeyer, 629 B.R. 372, 386 (Bankr. E.D. Pa. 2021) (emphasis added).

The same is true here.  The Trustee deemed this chapter 7 an asset case and objected to the Motion based on her initial and hurried determination of the value of the Property.  The Trustee certainly has the right—in fact, the duty—to liquidate assets which are of value to the estate.  But here the Trustee showed a lack of diligence in determining whether a sale—and the resulting dislocation of a family—was worthwhile.  The Debtors obtained a thorough, careful, and credible appraisal *three times*.  It is unclear from the record to what extent, if at all, the Trustee considered these appraisals prior to insisting that the Debtors' valuation was off by an astonishing $200,000.00.  The evidence presented shows that the realtor whom the Trustee relied on failed to perform a detailed or diligent analysis of the Property; he did not know the square footage of the land, did not review the deed or tax records, and essentially pulled an estimate from an online engine similar to Zillow.  Tr. at 98, 108, 122.

The Trustee thus proceeded on the assumption that it is "easier to have the house hit the market . . . and see if there's equity or not."  Tr. at 4.  Two (2) critical factors weigh against this streamlined approach.  First, the Trustee was confronted with credible, contrary evidence of value; there was reason to think that the quickly generated estimate of a highly unique property was incorrect.  Second, the Trustee ignores that the Property belongs to and houses a family. The mere thought of placing the home for sale was frightening for the Debtors, who understandably had a poignant reaction.  Tr. at 60-61, 79.

Most egregiously, the Trustee insists that the Debtors acted in bad faith and have not been forthcoming with the court.  Objection at 6; Tr. at 5.  Bad faith is a serious charge; it is an allegation that should only be employed upon an examination and determination of compelling

19

circumstantial or direct evidence.  Here, however, the record provides not a shred of evidence to support the contention that the Debtors acted in bad faith.  To the contrary, the Swartzs have proven themselves to be the very honest but unfortunate individuals who deserve a fresh start.  Regrettably, expensive and unnecessary roadblocks were placed between them and the completion of their case.

## VII.    CONCLUSION

Because the Court finds that the Debtors proceeded in good faith and provided an appraisal of their Property that is credible, accurate, and far below the Trustee's valuation, the Swartzs will be allowed to convert their case to one under chapter 13.  The Trustee's Objection rests a heavy weight on paper thin evidence and will, therefore, be overruled.

There is no need for a liquidation or for a larger chapter 13 plan payment because this Opinion determines that there is no non-exempt equity to administer.  Such a finding means that while chapter 13 is a viable option, the Debtors could also proceed—and protect their home—in a *no asset* chapter 7.  This approach would cost the Debtors less and allow them to discharge unsecured debt and obtain a proverbial and desired fresh start.  Thus, if the Debtors choose, they may withdraw their Motion to Convert and remain in a chapter 7.  An Order will be entered providing for this option.

**Date:**    June 30, 2025

**PATRICIA M. MAYER**
**U.S. BANKRUPTCY JUDGE**